[No. S046001. Jan. 23, 1997.]

HARVEY RICHARDS, Plaintiff and Respondent, v.
OWENS-ILLINOIS, INC., Defendant and Appellant.

## Counsel

Morgenstein & Jubelirer, Eliot S. Jubelirer, Lee Ann Huntington and Bruce A. Wagman for Defendant and Appellant.

Thelen, Marrin, Johnson & Bridges, Ronald F. Lopez, Miruni Soosaipillai, Haight, Brown & Bonesteel, Roy G. Weatherup, William J. Sayers, Caroline E. Chan, Brobeck, Phleger & Harrison, Thomas M. Peterson and Meredith N. Landy as Amici Curiae on behalf of Defendant and Appellant.

John C. Robinson and Bryce C. Anderson for Plaintiff and Respondent.

Steven M. Woodside, County Counsel (Santa Clara), Ann M. Ravel, Chief Assistant County Counsel, William C. Katzenstein, County Counsel (Riverside), Karen Keating Jahr, County Counsel (Shasta), Louise E. Renne, City Attorney (San Francisco), Patrick Mahoney, Elizabeth D. Laporte, Lieff, Cabraser, Heimann & Bernstein, Richard M. Heimann, Elizabeth J. Cabraser, William B. Hirsch, Robert J. Nelson and Jacqueline E. Mottek as Amici Curiae.

## OPINION

**BAXTER, J.**—Proposition 51 (Civ. Code, § 1431 et seq.),[1] adopted by the voters in 1986, provides that in a tort action governed by principles of comparative fault, a defendant shall not be jointly liable for the plaintiff's "non-economic damages," but shall only be severally liable for such damages "in direct proportion to that defendant's percentage of fault." (§ 1431.2, subd. (a).) Section 1714.45, adopted by the Legislature in 1987, provides that with specified exceptions, a manufacturer or seller "shall not be liable" in a "product liability action" for harm caused by the ingestion of a "common consumer product intended for personal consumption, such as . . . tobacco" which is "inherently unsafe" and consumed with "ordinary [community] knowledge" of its danger.

We confront a narrow but significant question: To the extent section 1714.45 protects tobacco companies from direct "liab[ility]" for harm caused by smoking, does it also preclude the allocation of proportionate "fault" to absent tobacco companies in a smoker's suit for asbestos-related lung injury, in order to reduce the "non-economic" damages payable by the asbestos defendant under Proposition 51?

The Court of Appeal concluded that section 1714.45 applies only in direct actions against suppliers of the products described by the statute, and has no effect when Proposition 51 is invoked in a suit from which such suppliers are absent. Hence, the Court of Appeal reasoned, the defendant in an asbestos action may reduce its own "non-economic damage" exposure by proving that tobacco suppliers share "fault" for lung injuries suffered by a plaintiff who smoked.

For its holding, the Court of Appeal relied primarily on *DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593 [7 Cal.Rptr.2d 238, 828 P.2d 140]

---

[1]All further unlabeled statutory references are to the Civil Code.

*(DaFonte)*. *DaFonte* held that Proposition 51 permits a tort defendant to apportion "fault" among all "tortfeasors" responsible for the injury, whether or not present in the action, including those who are immune from direct suit. There we concluded that in a farm employee's suit against a harvester manufacturer for injury caused by a defect in the machine's design, the defendant could limit its liability for "non-economic" damages by showing that the employer's negligence contributed to the injury, even though employers are statutorily immune from tort damages for job-related injuries to their employees.

However, we are persuaded that *DaFonte* does not govern here. The employer's immunity at issue in *DaFonte* derives narrowly from an alternate scheme of workers' compensation; as we made clear in *DaFonte*, this immunity does not imply that a negligent employer lacks legal "fault" or is not a "tortfeasor." The immunity accorded by section 1714.45 to suppliers of certain unhealthy consumer products such as tobacco is of a materially different kind. Section 1714.45 represents a legislative judgment that to the extent of the immunity afforded, such companies have no "fault" or responsibility, in the legal sense, for harm caused by their products. To the same extent, such companies are thus not "tortfeasors" to whom comparative "fault" can be assigned for purposes of Proposition 51.

Our conclusion in this regard disposes of the sole basis on which the appellant in this case has contended that the trial court should have allowed its "tobacco company defense." It follows that the judgment of the Court of Appeal must be reversed.

## FACTS

Plaintiff Harvey Richards (Richards), who was born in 1918, held various shipyard jobs from 1939 until his retirement in 1983. From 1950 until his retirement, he worked at Mare Island Naval Shipyard (Mare Island). In 1988, he sued Owens-Illinois, Inc. (Owens-Illinois) and numerous other manufacturers of asbestos products, claiming respiratory injury and fear of cancer arising from exposure to asbestos on the job. The complaint alleged causes of action based on negligence, strict liability for a "defective" product, and negligent and intentional infliction of emotional distress. Richards's case was consolidated for trial with the similar claims of four other plaintiffs.

Under procedures adopted by the Solano County Superior Court for general use in asbestos litigation, the trial took place in two phases. In the first phase, the jury was to determine, as to each plaintiff, whether exposure to asbestos was a proximate cause of injury and, if so, the total amount of

damages. Richards presented medical evidence that he has asbestosis, or reduced lung volume which results when inhalation of asbestos particles causes lung tissue to scar and thicken. The evidence further suggested that Richards, a longtime smoker, also has obstructive airway disease most likely due to smoking. According to Richards's expert, however, this condition was mild and would be asymptomatic absent the asbestosis.

Richards testified that he was exposed to uncontained insulation products at all his places of employment, though he was uncertain which, if any, contained asbestos. He further indicated that he has serious breathing problems, is progressively weakening, and fears he will contract cancer. The jury found that Richards had suffered an asbestos-related injury, and that he had sustained $5,000 in economic damages and $275,000 in "non-economic" damages. Between the first and second stages of trial, all the defendants except Owens-Illinois settled.

The second phase of trial, against Owens-Illinois alone, addressed liability and apportionment of damages. At this phase, plaintiffs received the benefit of a "burden-shifting" instruction generally applicable in Solano County asbestos litigation. Under this instruction, once the plaintiff has proved that a particular asbestos supplier's product was "defective," that the plaintiff's injury was legally caused by asbestos exposure, and that he was exposed to asbestos fibers from the defendant's product, the burden shifts to the defendant to prove that its product was not a legal cause of the injury.

Each plaintiff sought to show that he had been exposed to asbestos from a product manufactured by Owens-Illinois. Richards testified that during the 1950's at Mare Island, he sometimes worked around, and occasionally handled, uncontained insulation products when dust from these materials was in the air. Evidence was presented that Owens-Illinois' asbestos insulation product "Kaylo" was extensively used at Mare Island during this period, and that "Kaylo" gave off dust when used.

Owens-Illinois was allowed to show, in turn, that other asbestos manufacturers, and the plaintiffs' various employers, shared "fault" for the plaintiffs' long-term exposure to asbestos. Owens-Illinois was also permitted to present evidence that smoking was a "negligent" contributing factor to each plaintiff's condition. Richards himself acknowledged that he had smoked between one and two packs of cigarettes per day from 1941 until 1984. Undisputed evidence indicated that smoking sharply increases the risk of lung disease, including cancer, and works "synergistically" with asbestos exposure to enhance the severity of resulting damage to the lungs.

By *in limine* motions, Owens-Illinois sought permission to establish that, in addition to plaintiffs' own "negligence" for smoking, and the "fault"

assigned to other asbestos manufacturers and employers, cigarette manufacturers also shared "fault" for plaintiffs' injuries because they supplied the harmful tobacco products plaintiffs had consumed. Under Proposition 51, Owens-Illinois urged, the proportionate "fault" of tobacco companies for plaintiffs' injuries should further reduce, to that extent, Owens-Illinois's liability for the plaintiffs' "non-economic" damages.

Plaintiffs' counsel objected. Counsel did not cite section 1714.45 by number, but he argued that because the "law in California" says tobacco companies "haven't committed a tort" when consumption of their products causes injury, they cannot "share in the wealth as . . . tort-feasors." The court ruled that no "tobacco company defense" could be presented, because the tobacco companies "aren't on trial here." The court thereafter excluded all proffered evidence concerning the "fault" of tobacco manufacturers, and it refused to allow a verdict form in which "fault" could be apportioned to these entities.[2]

In his argument to the jury, Owens-Illinois's counsel urged at length that the plaintiffs were negligent because they continued to smoke long after they had notice that smoking was hazardous to health, and that the long-term consumption of tobacco products was a contributing cause of their lung diseases. The court's instructions made clear that each plaintiff's entire recovery must be reduced to the extent of his own comparative "negligence" contributing to his condition. The jury was further instructed to assign percentages of "fault" for each injury, adding up to a total of 100 percent, among (1) the plaintiff himself, (2) Owens-Illinois, (3) other manufacturers of asbestos to which the plaintiff was exposed, and (4) each employer who contributed to the exposure.

In Richards's case, the jury apportioned fault as follows: 1 percent to Owens-Illinois, 2.5 percent to Richards, and 96.5 percent to the remaining entities to which the jury was allowed to assign fault. After further adjustment for pretrial settlements, Richards recovered a net judgment against Owens-Illinois of $5,133.73.[3]

Owens-Illinois appealed. In its Court of Appeal briefs, Owens-Illinois cited as error the denial of its "tobacco company defense," the burden-shifting instruction, and several other unrelated trial issues.

[2]Though plaintiff's counsel failed to expressly identify section 1714.45 as the source of his objection, the nature of the objection was clear to the court and all counsel. Hence, we reject Owens-Illinois' contention that because of counsel's omission, plaintiff has waived, for purposes of appeal, all reliance on this statute.

[3]$2,831.50 of the judgment was attributed to "economic" damages, and $2,302.23 was attributed to "non-economic" damages. The former figure apparently represents the total amount of "economic" damages as reduced by Richards's comparative negligence (i.e., 97.5

The Court of Appeal reversed. Its basis for doing so was its conclusion that the trial court's rejection of the proffered "tobacco company defense" was prejudicial error. The Court of Appeal observed that under our *DaFonte* decision, apportionment of a defendant's "non-economic" damages for purposes of Proposition 51 must include the "universe of tortfeasors," including those who are immune from suit. The court perceived no material distinction between the employer's immunity considered in *DaFonte* and the tobacco companies' immunity involved in this case.

The Court of Appeal also resolved the other issues raised by Owens-Illinois. Certain of Owens-Illinois's arguments were rejected, but the Court of Appeal ruled, for purposes of guidance "if there is a retrial," that the burden-shifting instruction was improper and should not be given again.

Richards petitioned for review, raising only the "tobacco defense" issue. In its answer, Owens-Illinois confined itself to the same question and did not exercise its right to present other aspects of the Court of Appeal's decision for our consideration. (See Cal. Rules of Court, rule 28(e)(5).) Though we issued no order specifically limiting the issues on review, the parties' briefs on the merits are likewise concerned only with the "tobacco company" question. We therefore confine our decision to that issue.

In doing so, we conclude that the Court of Appeal's analysis was incorrect in this respect. We will therefore reverse the judgment of the Court of Appeal.[4]

---

percent of $5,000, or $4,875) less pretrial payments, for which entire net amount Owens-Illinois remained *jointly and severally* liable even though it was found only 1 percent at fault. Under Proposition 51, the latter figure apparently constitutes a *several* judgment representing Owens-Illinois's 1 percent share of total "non-economic" damages ($275,000 × .01 = $2,750) less pretrial payments.

[4]Proposition 51 went into effect on June 4, 1986, the day after its adoption by the voters. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1193, fn. 2 [246 Cal.Rptr. 629, 753 P.2d 585] (*Evangelatos*).) In *Evangelatos*, we held that Proposition 51 is not retroactive, and that the former rule of full joint and several liability for all tort damages thus applies to all causes of action that "accrued" before the measure's effective date. (*Evangelatos, supra,* at p. 1227.) Richards filed his suit in October 1988, after Proposition 51 went into effect. The complaint and evidence suggest that Richards had an abnormal X-ray in late 1987 or early 1988 and that he was diagnosed with asbestosis at that time. Richards had not previously noticed breathing difficulties beyond those he expected for a particular level of activity at his age. However, his medical witness indicated that the progression of lung disease noted in the 1987-1988 X-ray would produce unusual shortness of breath. The parties to this appeal present no issue whether Richards's cause of action accrued before Proposition 51 went into effect, and both appear to assume that Proposition 51 applies here. Accordingly, we, too, will proceed from that premise.

## Discussion

The evolution of California law governing liability for tortious injury is amply documented. In general, a tortfeasor is liable for all damage of which his tortious act was *a* proximate cause. "[He] may not escape this responsibility simply because another act—either an 'innocent' occurrence such as an 'act of God' or other [tortious] conduct—may also have been a [concurrent] cause of the injury." (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 586 [146 Cal.Rptr. 182, 578 P.2d 899] (*American Motorcycle*), italics in original; see generally, Civ. Code, § 1714; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 970, pp. 360-361; Rest.2d Torts, §§ 431, 432, 439, pp. 428, 430, 464.)

"In cases involving multiple tortfeasors, [this] principle . . . has commonly been expressed in terms of 'joint and several liability.'" (*American Motorcycle, supra*, 20 Cal.3d at p. 586.) "Joint and several liability" means that "[w]hen [the] independent [tortious] actions of a number of tortfeasors are each a proximate cause of a single injury, each tortfeasor is . . . personally liable for the damage sustained, and the injured person may sue one or all of the tortfeasors to obtain a recovery for his injuries; the fact that one of the tortfeasors is impecunious or otherwise immune from suit does not relieve another tortfeasor of his liability for damage which he himself has proximately caused." (*American Motorcycle, supra*, 20 Cal.3d at p. 587.)

Though a rule of joint and several liability protects the plaintiff's right to full compensation for his tortious injury, its traditional application often forced a defendant to pay a proportion of the total damages that was far in excess of his relative fault, with no recourse against other concurrent tortfeasors. By statute, the right of "contribution" exists only among those tortfeasors who are jointly liable on the plaintiff's judgment, and then only for amounts in excess of each such defendant's equal "pro rata" share. (Code Civ. Proc., §§ 875, 876; see *American Motorcycle, supra*, 20 Cal.3d at pp. 592, 599 et seq.) Courts recognized an "equitable" right to "indemnity" among joint tortfeasors, but in earlier years this doctrine operated on an "all or nothing" basis, allowing the entire loss to be borne by, or shifted to, the most culpable tortfeasor alone. (*American Motorcycle, supra*, at pp. 593-595.)

Under the traditional common law, similar "all or nothing" doctrines operated *against* the injured person, as powerful exceptions to the rule that one is responsible for all damage proximately caused by his tort. The doctrine of contributory negligence held that if the plaintiff's own want of due care had contributed in any measure to his injury, his recovery in tort

was barred, even though the tortious conduct of others was also responsible for the harm. (*American Motorcycle, supra*, 20 Cal.3d at p. 587.) Moreover, if the plaintiff had knowingly and voluntarily "assumed the risk" of another's breach of duty, he could recover nothing when the breach resulted in his injury. (See *Knight* v. *Jewett* (1992) 3 Cal.4th 296, 304 [11 Cal.Rptr.2d 2, 834 P.2d 696].)

Considerations peculiar to the workers' compensation system had caused the development of special rules in that area. When an employee was injured on the job, the employer was liable for statutory benefits "without regard to negligence" (Lab. Code, § 3600, subd. (a)); on the other hand, even if the employer was negligent, his payment of such benefits was "in lieu of any other liability" for the injury (*ibid.*), and they were the employee's "exclusive remedy" against the employer (*id.*, § 3602, subd. (a)).

No implication arose, however, that the employer was thereby absolved of "fault," or that his "fault" was legally irrelevant in the tort system. Indeed, except as otherwise provided by the workers' compensation laws, the employer remained a full participant in that system as it then operated.

Thus, despite his receipt of workers' compensation benefits as his sole remedy against the employer, the employee could sue all other tortiously responsible persons for the full amount of his damages. (Lab. Code, § 3852.) To prevent double recovery, however, any damages awarded the employee in a trial against third party tortfeasors " 'must be reduced by the amount of [workers'] compensation [benefits] he received.' " (*Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829, 834 [150 Cal.Rptr. 888, 587 P.2d 684] (*Associated Construction*), quoting *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 73 [17 Cal.Rptr. 369, 366 P.2d 641].)

By the same token, where third parties were responsible in tort for the employee's injuries, the employer could seek recoupment of benefits paid or owed to the employee, either by suing such third parties directly, or by asserting a lien or credit against any tort recovery by the employee. (Lab. Code, § 3850 et seq.) But if the employer himself was even slightly at fault for the injury, his recoupment of benefits was entirely precluded. (*Roe* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 884, 889 [117 Cal.Rptr. 683, 528 P.2d 771]; *Witt* v. *Jackson, supra*, 57 Cal.2d 57, 73.)

Two decades ago, we began to address the most arbitrary effects of this traditional system upon plaintiffs, defendants, and employers. "In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (*Li*), [we] eliminated the all-or-nothing doctrine of contributory negligence. Thereafter, a plaintiff's recovery against others responsible

for the injury could only be reduced in proportion to his or her own share of fault." (*DaFonte, supra,* 2 Cal.4th 593, 598.) *Li* also made clear that insofar as the plaintiff's assumption of risk was but "a variant of contributory negligence," the assumption of risk doctrine should be merged "into the general scheme of assessment of liability in proportion to fault." (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 825 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (*Li*).)

"In *American Motorcycle,* we concluded that *Li*'s comparative fault principles did not abrogate each defendant's joint and several liability for damages attributable to the fault of others. Our opinion adhered to the pre-*Li* principle that culpable defendants, rather than the injured plaintiff, should bear the risk of inadequate contribution by others responsible for the harm. (20 Cal.3d at pp. 588-590.)" (*DaFonte, supra,* 2 Cal.4th at p. 598.) We also made clear in *American Motorcycle* that when reducing the plaintiff's recovery in proportion to his fault, that fault must be weighed "against the combined total of all other causative negligence. . . ." (*American Motorcycle, supra,* 20 Cal.3d at p. 589, fn. 2.) This meant, in effect, that "[n]either the allocation of fault, nor the amount of a joint and several damage award, 'var[ied] by virtue of the particular defendants who happen[ed] to be before the court . . . .' [Citation.]" (*DaFonte, supra,* 2 Cal.4th at p. 603, quoting *American Motorcycle, supra,* 20 Cal.3d at p. 589, fn. 2.)

"However, *American Motorcycle* took some steps to ameliorate the harshness of the joint-and-several-liability rule. Our opinion concluded that one sued for personal injury could join other concurrent tortfeasors in the original action in order to allocate proportionate responsibility, or could seek equitable indemnity from such tortfeasors in proportion to their fault. (20 Cal.3d at pp. 591-598, 604-607.) More recent cases make clear that any share of damages attributable to an insolvent tortfeasor should be apportioned equitably among the solvent tortfeasors. [Citations.]" (*DaFonte, supra,* 2 Cal.4th 593, 598.)

We also acted to accommodate the workers' compensation system to the principles of *Li* and *American Motorcycle.* We concluded that insofar as permitted by the employer's limited statutory liability, he should share normally in the payment of damages for a job-related injury to the extent of his own proportionate fault.

Thus, we decided, the rule that an employer's negligence necessarily precluded all recoupment of workers' compensation benefits from a third party tortfeasor must be abrogated. In a system of comparative fault, if the employer paid or owed benefits representing a share of the employee's

damages in excess of the employer's percentage of fault, the employer must be allowed to recoup the excess only from third party tortfeasors, or by lien or credit against the employee's tort settlement or judgment, but if the employer's percentage of fault exceeded his benefit liability, no recoupment could be had. (*Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 512-513 [156 Cal.Rptr. 41, 595 P.2d 619]; *Associated Construction, supra,* 22 Cal.3d 829, 842.) "Under this formula, third party defendants remained jointly and severally liable to the injured employee for all damages attributable to the employer's fault which were not covered by workers' compensation benefits. [Citations.]

"In sum, by 1986 the courts had eliminated certain inequities of the former tort recovery system, but so-called 'deep pocket' defendants whose fault was slight could still be saddled with large damage awards mainly attributable to the greater fault of others who were able to escape their full proportionate contribution. [Citation.] Proposition 51 sought to modify this system of recovery.

"Proposition 51 first codified its purpose by adding section 1431.1 to the Civil Code. This statute decries the unfairness and cost of the 'deep pocket' rule to both 'governmental and private defendants' (*id.,* subds. (a)-(c)) and cites the exploitation of relatively blameless defendants who 'are perceived to have substantial financial resources or insurance coverage . . . .' (*Id.,* subd. (b).) Section 1431.1 declares that in order to remedy these inequities and avoid 'catastrophic' financial consequences to public and private individuals and entities, 'defendants in tort actions shall be held financially liable in closer proportion to their degree of fault.' (*Id.,* subd. (c).)

"To carry this intent into effect, Proposition 51 amended section 1431 and added section 1431.2. Amended section 1431 establishes a presumption that '[a]n obligation imposed upon several persons . . . is presumed to be joint, and not several, *except as provided in Section 1431.2* . . . .' (Italics added.) New section 1431.2 declares that in actions for wrongful death, personal injury, or property damage based on comparative fault, 'the liability of each defendant for non-economic damages shall be several only and shall not be joint.' The statute further specifies that '[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount.' (*Id.,* subd. (a).)" (*DaFonte, supra,* 2 Cal.4th at pp. 599-600.)

In *DaFonte,* we considered the correct method of apportioning "fault" for purposes of Proposition 51. There, a farm employee sued the manufacturer

of a mechanical grape harvester, alleging that the machine's unsafe design had caused him personal injury. The manufacturer sought to reduce its liability for "non-economic" damages under Proposition 51 by demonstrating that negligent safety policies of the plaintiff's employer, who was immune from suit under the workers' compensation law, were partly responsible for the injury. The plaintiff urged that Proposition 51 only allows comparison of a defendant's fault with that of all other *tort defendants*, and does not permit apportionment of fault to absent or immune tortfeasors. We agreed with the manufacturer, however, that *"all fault responsible for the plaintiff's injuries"* must be considered. (*DaFonte, supra,* 2 Cal.4th at p. 603, italics in original.)

We reasoned as follows: By the plain terms of the initiative, each "defendant's" share of the plaintiff's "non-economic" damages is strictly limited by that "defendant's" proportionate share of all "fault." With respect to this portion of the plaintiff's loss, Proposition 51 abolishes the system of joint and several liability among tortfeasors "root and branch" by removing a "defendant's" exposure to payment of damages in excess of his or her own "fault," and by placing on the plaintiff, rather than the "defendant[s]," the risk that any person at "fault" for the injury will fail to contribute his or her full proportionate share. The statutory protection is constant and absolute; it does not permit a "defendant's" share of "non-economic" damages to vary depending upon which other tortfeasors happen to be before the court, or upon the *reason* why a full proportionate contribution from each such tortfeasor may not be forthcoming. Regardless of whether the gap is caused by the insolvency, the absence, or even the immunity of another tortfeasor, each culpable "defendant" remains liable for the same amount of "non-economic" damages—those proportionate to his or her own degree of "fault." (*DaFonte, supra,* 2 Cal.4th at pp. 600-604.)

Owens-Illinois and its amici curiae[5] contend that *DaFonte* dictates a similar result in this case. They urge that even if tobacco companies are themselves immune from liability for their products' contribution to plaintiff's lung disease, these companies' proportionate responsibility for the injury—i.e., their comparative "fault"—necessarily reduces *Owens-Illinois*'s own degree of "fault" for the same injury. Hence, it is argued, the comparative "fault" of the tobacco companies must apply to diminish Owens-Illinois' proportionate share of liability for "non-economic" damages under Proposition 51.

---

[5]Amicus curiae briefs on behalf of Owens-Illinois have been filed by Fibreboard Corporation, the Center for Claims Resolution, and Sequoia Ventures, Inc. The City and County of San Francisco, and the Counties of Riverside, Santa Clara, and Shasta, have filed an amicus curiae brief taking no position on the Proposition 51 question, but urging us not to decide issues concerning the meaning of section 1714.45 which are beyond the scope of the matter before us. (See *post,* fn. 8.)

However, *DaFonte* held only that, by the specific terms of Proposition 51, a defendant's "fault" must be compared to all other "fault" responsible for the injury. As we made clear in *DaFonte*, the employer's immunity from tort damages for job-related injuries, an immunity narrowly founded on an alternative compensation scheme, does not imply any absence of legal "fault" or tortious responsibility in an employer whose act or omission contributed to the harm. (*DaFonte, supra,* 2 Cal.4th at pp. 598-599, 604, fn. 6.) On the other hand, to the extent the immunity of section 1714.45 would apply in a direct action against tobacco suppliers, that immunity arises from a premise which is also inconsistent with the allocation of legal "fault" to such entities under Proposition 51, as contemplated in *DaFonte.* The contention of Owens-Illinois and its amici curiae must therefore be rejected.

Section 1714.45 provides that a manufacturer or seller "shall not be liable" in a "product liability action" for injury or death caused by a product which (1) "is *inherently unsafe* and . . . is *known to be unsafe* by the ordinary consumer" who consumes the product with "ordinary [community] knowledge" of its danger, and (2) "is a common consumer product intended for personal consumption, such as sugar, castor oil, alcohol, *tobacco*, and butter, as identified in comment i to Section 402A of the Restatement (Second) of Torts." (§ 1714.45, subd. (a), italics added.)[6]

Contending that section 1714.45 is irrelevant to the case before us, Owens-Illinois and its amici curiae reason as follows: The statute declares that the suppliers of such products are immune from direct *"liab[ility]"* under the circumstances described, but it contains no similar express declaration that the "fault" of such entities cannot be considered in other contexts where their "liab[ility]" is not at issue. Indeed, the statute pronounces itself "declarative" of existing California law, which necessarily includes the previously adopted Proposition 51. Moreover, the abbreviated legislative

---

[6]Section 1714.45 provides in full as follows:

"(a) In a product liability action, a manufacturer or seller shall not be liable if:

"(1) The product is inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community; and

"(2) The product is a common consumer product intended for personal consumption, such as sugar, castor oil, alcohol, tobacco, and butter, as identified in comment i to Section 402A of the Restatement (Second) of Torts.

"(b) For purposes of this section, the term 'product liability action' means any action for injury or death caused by a product, except that the term does not include an action based on a manufacturing defect or breach of an express warranty.

"(c) This section is intended to be declarative of and does not alter or amend existing California law, including Cronin v. J.B.E. Olson Corp., (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], and shall apply to all product liability actions pending on, or commenced after, January 1, 1988."

history of section 1714.45 shows it was a hasty compromise of long-divergent interests, intended only to prevent withdrawal of the enumerated products from the market, against the wishes of society, by eliminating their suppliers' direct monetary exposure for harm caused by the products' normal consumption. Under these circumstances, the statute should be narrowly construed so as to allow the assignment of "fault" to these suppliers in settings where they will face no monetary liability.

These contentions have superficial appeal, but they do not withstand scrutiny. Whatever the most immediate purpose of section 1714.45, its plain language reveals a premise which is inconsistent with the narrow construction proposed by Owens-Illinois and its amici curiae.

Section 1714.45 draws its express inspiration from product liability principles addressed by section 402A of the Restatement Second of Torts (Restatement), and particularly comment *i* thereto (comment *i*). (See Civ. Code, § 1714.45, subd. (a)(2).) Section 402A of the Restatement proposes generally that when a manufacturer or distributor sells a product "in a defective condition *unreasonably dangerous* to the user or consumer" (p. 347, italics added), and the product reaches that person, as expected and intended, without substantial change in its condition, the seller is "subject to liability" for physical harm "thereby caused to the ultimate user or consumer."

However, comment *i* asserts an important qualification of the general rule, giving reasons that are significant to our analysis here. Comment *i* makes clear that, under the Restatement formulation, "[t]he rule [of liability] applies *only* where the defective condition of the product makes it *unreasonably* dangerous to the user or consumer." (Restatement, p. 352, italics added.) As comment *i* then explains, "[m]any products cannot possibly be made entirely safe for all consumption," but if a product is pure and unadulterated, its *inherent* or *unavoidable danger*, commonly known to the community which consumes it anyway, does not expose the seller to liability for resulting harm to a voluntary user.

Thus, comment *i* observes, "[o]rdinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture," but this is not what the Restatement means by "unreasonably dangerous." "Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics . . . . *Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful* . . . . Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks . . . ." (Restatement, pp. 352-353, italics added.)

The clear premise of comment *i* is that no "liability" arises under the circumstances therein described because *there is no sound basis for liability.* In other words, comment *i* posits, a manufacturer or seller *breaches no legal duty* to voluntary consumers by merely supplying, in unadulterated form, a common commodity which cannot be made safer, but which the public desires to buy and ingest despite general understanding of its inherent dangers.

California has developed its own law of liability for a "defective" product (See *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]), which is assimilated into the comparative "fault" system (see *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162]), but whose substance differs in some respects from the Restatement's views. In particular, California has rejected the Restatement's limitation of liability to products that are both "defective" *and* "unreasonably dangerous." (See *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153].) Instead, California law permits recovery for all injuries caused because a product was "defective" either in manufacture (i.e., it was a mistake in the production process) or in design (i.e., even though marketed as intended, it failed to meet "ordinary consumer expectations" of safety or harbored "excessive preventable danger"). (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].)

Section 1714.45 thus did not adopt the "unreasonably dangerous" terminology of Restatement section 402A, and of comment *i* thereto, but the statute still clearly imports into California law the fundamental premise of comment *i*. ██ Like comment *i*, section 1714.45 negates "liab[ility]" to voluntary users for the mere manufacture or sale of "common consumer product[s] intended for personal consumption," specifically including "sugar, castor oil, alcohol, tobacco, and butter," as "identified in comment [*i*]," which are "inherently unsafe" and are understood to be so by "ordinary knowledge common to the community," but which are nonetheless consumed with such ordinary knowledge. Like the Restatement, the statute thus precludes "liab[ility]" for the furnishing of such products *on grounds* that under the circumstances described in the statute, their "inherent" dangers do not make them "defective" when used as intended by voluntary consumers who are aware of the risks, and suppliers breach no legal duty to such knowing and voluntary consumers by merely furnishing these products in unadulterated form. In other words, under the conditions described by section 1714.45, a tobacco supplier simply commits no tort against knowing and voluntary smokers by making cigarettes available for their use.

██ It would be anomalous if, though immunized on such grounds from direct liability for providing an "inherently unsafe" product to a knowing

and voluntary consumer, the supplier could nonetheless be assigned "fault" for doing so in an action between that same consumer and a third party defendant. The principles of *DaFonte, supra*, 2 Cal.4th 593, do not require such a result, and we decline to reach it. We conclude that to the extent section 1714.45 affords tobacco suppliers immunity from "liab[ility]" in direct actions against them, on grounds that the immunized conduct breaches no duty and constitutes no tort, the statute also precludes indirect assignment of comparative "fault" or responsibility to such entities for purposes of Proposition 51.

Owens-Illinois suggests we must reach a contrary result because subdivision (c) of section 1714.45 states that the statute is "declarative" of "existing California law." As Owens-Illinois points out, when section 1714.45 was enacted, "existing California law" included the previously adopted Proposition 51. However, section 1714.45 makes no specific reference to Proposition 51, and there is no necessary relationship between the two statutes that affects our analysis here. Nothing in Proposition 51 requires a determination, contrary to the premise of section 1714.45, that cigarette manufacturers have legal "fault" or responsibility for smoking injury which may reduce the amount of the smoker's "non-economic" damage recovery in a suit against a third party. Thus, Owens-Illinois's contention must fail.[7]

Owens-Illinois urges that if section 1714.45 was intended, under the conditions described, as a complete abrogation of normal tort rules governing duty of care, causation, "fault," and product defects, the statute would have said so explicitly. Indeed, Owens-Illinois suggests, the Legislature has expressed just such purposes in several analogous laws whose language is broader than that of section 1714.45. (Citing, as examples, §§ 846 [owner of estate in land generally "owes no duty of care" to keep the premises safe for uncompensated recreational use], 1714, subd. (b) [furnishing of alcoholic beverages to intoxicated person is "not the proximate cause" of injuries resulting from intoxication], and 1714.4 [firearms and ammunition are not "defective" in design merely because they can cause injury when discharged;

---

[7]As noted above (fn. 6, *ante*), subdivision (c) of section 1714.45 provides in pertinent part that "[t]his section is intended to be declarative of and does not alter or amend existing California law, including Cronin v. J.B.E. Olson Corp., (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153]." In *Cronin*, we rejected the Restatement view that one suing for injuries on a theory of strict product liability must prove the product was both "defective" and "*unreasonably* dangerous." (*Cronin* v. *J.B.E. Olson Corp., supra*, 8 Cal.3d at pp. 127-135.) Thus subdivision (c) of section 1714.45, including its reference to *Cronin*, may have been intended simply to "[eliminate] doubt, if there was any, that the new statute left untouched the rule, reaffirmed in *Cronin*, that a plaintiff in a products liability case seeking recovery upon the theory of strict liability need not establish that the defect in the product that caused his injuries made the product unreasonably dangerous." (*American Tobacco Co.* v. *Superior Court* (1989) 208 Cal.App.3d 480, 489 [255 Cal.Rptr. 280].)

actual injuries from discharge of firearms or ammunition "are not proximately caused" by such potential for harm].) Hence, Owens-Illinois insists, the absence of similar language from section 1714.45 is significant.

We are not persuaded. The linguistic variety itself in these laws demonstrates that the Legislature, when addressing a series of distinct tort-reform issues, has chosen no consistent phraseology to achieve its objectives. On the other hand, the import of section 1714.45 itself is clear. Though the statute states only an exemption from direct "liab[ility]" where specified conditions are met, the express premise which *justifies* this immunity is of a broader nature. This premise is that suppliers of certain products which are "inherently unsafe," but which the public wishes to have available despite awareness of their dangers, should not be responsible in tort for resulting harm to those who voluntarily consumed the products despite such knowledge. With respect to injuries meeting the statute's requirements, that principle precludes the assignment of legal "fault" to such suppliers in all contexts, including suits from which they are absent by law.

Owens-Illinois observes that the Legislature has adopted numerous regulatory, research, and prevention programs which express its compelling concern for reducing tobacco use in California. Hence, Owens-Illinois reasons, section 1714.45 cannot be deemed a policy judgment that cigarettes are not "defective," or that suppliers have no legal "fault" or responsibility for providing them.

In the context at issue here, however, the Legislature has made just such a judgment. The laws cited by Owens-Illinois certainly demonstrate the high level of public and political understanding that tobacco products are harmful. They also indicate political support for some responsive measures designed to discourage smoking. On the other hand, lawmakers continue to honor the apparent public preference for retaining these products on the market, and for preserving a right of personal choice to enjoy them, despite their known risks. In this regard, the Legislature has determined, the mere manufacture and sale of such products create no *tortious* responsibility to *individuals* who voluntarily consumed them with the community's knowledge that they were unsafe.

Owens-Illinois notes we held in *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795] that principles of comparative fault require consideration of the effects of smoking on the plaintiff's injuries, including his reasonable fear of cancer. (*Id.* at p. 1011.) But *Potter* contains no support for the specific argument Owens-Illinois is making here. *Potter*, of course, did not address the provisions of section

1714.45. Moreover, *Potter* neither states nor implies that the proper allocation of damages for smoking-related injury is to be achieved by assigning responsibility to tobacco companies. On the contrary, we indicated that the issue was the legal effect of any "evidence that plaintiffs, *on their own, voluntarily* ingested this toxic substance." (*Potter, supra,* 6 Cal.4th at p. 1010, italics added.)

On the narrow issue before us, we therefore conclude that the Court of Appeal erred by reversing the judgment for Richards on grounds that Owens-Illinois should have been allowed to assign "fault" to absent tobacco companies in order to reduce its liability for Richards's "non-economic" damages under Proposition 51. Any and all other issues concerning the proper allocation of legal responsibility for the consequences of smoking are beyond the scope of our decision, and we express no opinion thereon.[8]

Because the Court of Appeal incorrectly awarded Owens-Illinois a new trial to pursue its "tobacco defense," we must reverse the Court of Appeal's judgment. In doing so, however, we must remand for consideration of a question previously undecided by the Court of Appeal, but rendered material by our own resolution of the "tobacco defense" issue.

As noted above, after it reversed the trial court's judgment for refusing to allow Owens-Illinois's "tobacco defense," the Court of Appeal also concluded, for purposes of guidance in any retrial, that the Solano County Superior Court's burden-shifting instruction was "erroneous." Richards has not challenged that ruling in this court. Because we have now concluded that

---

[8]In order to dispose of this appeal as indicated, it is not necessary to determine the exact substantive scope of the immunity described by section 1714.45, because Owens-Illinois has never litigated that issue. On the apparent assumption that tobacco companies enjoy "nearly complete" immunity from direct liability for harm to smokers caused by the availability of cigarettes (see *American Tobacco Co.* v. *Superior Court, supra,* 208 Cal.App.3d 480, 487), Owens-Illinois did not cross-complain against those entities. Moreover, when asserting its right to mount a "tobacco company defense" under Proposition 51, Owens-Illinois argued only that, however the immunity might apply in a direct suit against tobacco suppliers, it is irrelevant when a third party defendant seeks to allocate "fault" to absent tobacco companies for purposes of reducing its own share of "non-economic" damages. Owens-Illinois did not challenge the holding of *American Tobacco,* and made no offer of proof suggesting that if section 1714.45 did apply in the Proposition 51 context, Owens-Illinois would nonetheless produce evidence coming within an exception to the conduct immunized by the statute. In oral argument before this court, counsel for Owens-Illinois effectively conceded that its "tobacco company defense" would simply have demonstrated the risks of smoking and did not seek to prove any conduct for which tobacco companies might be subject to liability as an exception to the immunity described in section 1714.45. Hence, on the narrow issue before us for review, we may conclude that the trial court committed no error by rejecting Owens-Illinois's proffered defense. In doing so, we need not and do not take any position on the exact parameters of the immunity provided by section 1714.45, or on the correctness of the *American Tobacco* decision in this regard.

denial of the "tobacco defense" does not warrant a new trial, it becomes necessary to determine whether the additional error cited by the Court of Appeal is itself grounds for such relief. The Court of Appeal should therefore determine, in the first instance, whether the "erroneous" burden-shifting instruction given in the trial of this matter caused prejudice warranting reversal of the trial court judgment in Richards's case. (See Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

We observe, however, that the propriety of the burden-shifting instruction given in this case is currently pending before us in Owens-Illinois's appeal of a companion judgment from the same trial. (*Rutherford* v. *Owens-Illinois, Inc.*, review granted July 13, 1995 (S046944).) Should we decide that matter while this case remains pending before the Court of Appeal on remand, nothing we say here is intended to preclude the Court of Appeal from applying such intervening authority in reaching a proper disposition. (See, e.g., *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24-25 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Salazar* v. *Eastin* (1995) 9 Cal.4th 836, 859 [39 Cal.Rptr.2d 21, 890 P.2d 43]; *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 179 [18 Cal.Rptr. 369, 367 P.2d 865].)

The judgment of the Court of Appeal is reversed, and the cause is remanded for further proceedings consistent with the views expressed in this opinion.

George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

On February 19, 1997, the opinion was modified to read as printed above.