[No. S090420. Aug. 5, 2002.]

JOSEPH NAEGELE, as Trustee, etc., et al., Plaintiffs and Appellants, v. R.J. REYNOLDS TOBACCO COMPANY et al., Defendants and Respondents.

RICHARD DONALDSON, Plaintiff and Appellant, v. R.J. REYNOLDS TOBACCO COMPANY et al., Defendants and Respondents.

**COUNSEL**

Wartnick, Chaber, Harowitz, Smith & Tigerman, Wartnick, Chaber, Harowitz & Tigerman, Harry F. Wartnick, Madelyn J. Chaber, Phillip Scott Chan; Law Offices of Daniel U. Smith, Daniel U. Smith and Ted W. Pelletier for Plaintiffs and Appellants.

Meyers, Nave, Riback, Silver & Wilson and Andre J. Saltzman for Professor Stephen D. Sugarman as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Dennis Eckhart, Assistant Attorney General, and Peter M. Williams, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, H. Joseph Escher III, Ethan P. Schulman, Keith D. Kessler, Richard Shively and Anne-Marie Eileraas for Defendant and Respondent R.J. Reynolds Tobacco Company.

Sedgwick, Detert, Moran & Arnold and Frederick D. Baker for Defendant and Respondent Brown & Williamson Tobacco Corporation.

Fred Main for California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Respondents.

William L. Gausewitz for The Alliance of American Insurers, The American Insurance Association, The National Association of Independent Insurers, The National Association of Mutual Insurance Companies and The Reinsurance Association of America as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**KENNARD, J.**—Tobacco-related illnesses are a leading cause of death in this state and worldwide, and these debilitating illnesses have imposed enormous costs on tobacco users, their families, and society. (See, e.g., Health & Saf. Code, § 104350, subd. (a).) Although the risk of illness and death from tobacco use has become increasingly well known in recent decades, tobacco consumption continues to be widespread, at least in part because tobacco contains nicotine, a substance the Surgeon General of the United States has determined to be addictive. (U.S. Surgeon Gen. Rep., The Health Consequences of Smoking: Nicotine Addiction (1988) <www.cdc.gov/tobacco/sgr_1988.htm> [as of Aug. 5, 2002].) In 1987, the California Legislature enacted former section 1714.45 of California's Civil Code[1] (which we here sometimes refer to as the Immunity Statute) stating that in a product liability action a court could not require a manufacturer or seller to pay damages for injuries caused by certain products, including tobacco products, that are inherently unsafe and known to be unsafe by the ordinary consumer of that product. (Stats. 1987, ch. 1498, § 3, p. 5778 (hereafter sometimes former section 1714.45).) Ten years later, the Legislature repealed the Immunity Statute as it applied to manufacturers of tobacco products. (Stats. 1997, ch. 570, § 1.)

In the companion case of *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828 [123 Cal.Rptr.2d 40, 50 P.3d 751] (*Myers*), we consider how the repeal of the statutory immunity affects the liability of tobacco manufacturers for injuries caused by tobacco use before, during, and after the 10-year period during which the Immunity Statute was in effect. In *Myers,* we hold that, because the repeal was not retroactive, the Immunity Statute continues to provide an immunity for tobacco companies in product liability actions, but only for conduct they engaged in during the 10-year period when the Immunity Statute was in effect.[2] The liability of tobacco companies based on their conduct outside the 10-year period is governed by general tort principles.

Here, we are asked to decide what *forms of conduct* by tobacco companies during the 10-year immunity period come within the protection conferred by the Immunity Statute. The Court of Appeal held that, as applied to liability for injuries caused by tobacco products, the Immunity Statute covers all conduct by tobacco companies acting as manufacturers or sellers of tobacco

---

[1]Further undesignated statutory references are to the Civil Code.

[2]As in *Myers,* we use the term "immunity" rather loosely to describe the effect of a law that declares certain described conduct not to be a legal wrong or tort, and thus not a basis for liability.

products except conduct resulting in manufacturing defects or breach of express warranty. We, however, conclude that the Immunity Statute's protection is not so broad and that it does not extend to allegations that tobacco companies, in the manufacture of cigarettes, used additives that exposed smokers to dangers beyond those commonly known to be associated with cigarette smoking.

## I

Plaintiff Edwin Brigham smoked cigarettes from 1950 until 1996, when he was diagnosed with lung cancer. He sued defendants R.J. Reynolds Tobacco Company and Brown & Williamson Tobacco Corporation seeking personal injury damages on theories of negligence, product liability, and fraud. Defendants demurred, citing the Immunity Statute as a bar to all of plaintiff's causes of action. The trial court sustained defendants' demurrer but granted plaintiff leave to amend the complaint.

When defendants thereafter demurred to plaintiff's first amended complaint, the trial court sustained the demurrer and dismissed plaintiff's lawsuit against defendants. On plaintiff's appeal, the Court of Appeal affirmed.[3] We granted plaintiff's petition for review.

## II

At issue here is what types or categories of conduct by tobacco companies fall within the immunity given to them by the Immunity Statute, which was in effect from January 1, 1988, until December 31, 1997. The statute specifies that the immunity it gives to manufacturers and sellers of specified inherently unsafe products, including tobacco, applies in product liability actions. (Former § 1714.45, subd. (a), Stats. 1987, ch. 1498, § 3, pp. 5778-5779.) The statute defines a product liability action as "any action for injury or death caused by a product, except that the term does not include an action based on a manufacturing defect or breach of an express warranty."

---

[3]Plaintiff died while the appeal was pending, and the Court of Appeal granted the application of Joseph Naegele and others as trustees to substitute for plaintiff. For simplicity's sake, we refer to both Brigham and the trustees as plaintiff.

The Court of Appeal also consolidated plaintiff's appeal for purposes of oral argument with that of Albert J. Pavolini, who had likewise claimed in his lawsuit that he suffered personal injury caused by smoking cigarettes. When Pavolini died, the Court of Appeal substituted his successor in interest, Richard Donaldson, as plaintiff in that case. Because Donaldson did not seek review here, we do not further discuss that consolidated matter.

(Former § 1714.45, subd. (b), Stats. 1987, ch. 1498, § 3, p. 5779.)[4] Therefore, the immunity conferred by the Immunity Statute does not cover liability for manufacturing defects in tobacco products or for a tobacco company's breach of an express warranty, but otherwise it appears in general to cover all liability for injury or death caused by tobacco products.

Additional limitations on the scope of the immunity may be deduced from the history and purpose of the Immunity Statute, which we examined in detail in *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985 [60 Cal.Rptr.2d 103, 928 P.2d 1181] (*Richards*), a unanimous decision. The statute's express premise, we said, was "that suppliers of certain products which are 'inherently unsafe,' but which the public wishes to have available despite awareness of their dangers, should not be responsible in tort for resulting harm to those who voluntarily consumed the products despite such knowledge." (*Id.* at p. 1002.) We described the Immunity Statute as based on the principle that "if a product is pure and unadulterated, its inherent or unavoidable danger, commonly known to the community which consumes it anyway, does not expose the seller to liability for resulting harm to a voluntary user." (*Id.* at p. 999, italics omitted.) Thus, as applied to tobacco products, the Immunity Statute was intended to protect tobacco companies from liability for their conduct as manufacturers and sellers of products containing tobacco that is pure and unadulterated, when the claim seeks damages for personal injuries or death resulting from dangers or risks that are commonly known to be inherent in tobacco products.

We now apply this understanding of the purpose and scope of the Immunity Statute to the allegations of plaintiff's first amended complaint, which seeks damages from defendant tobacco companies for plaintiff's lung cancer, which was diagnosed in October 1996. At that time, plaintiff had smoked cigarettes regularly since 1950. His complaint alleged causes of action for negligence, product liability, and various theories of fraud, based, in part at least, on defendants' conduct in manufacturing and distributing cigarettes during the statutory immunity period.

---

[4] Former section 1714.45 provided: "(a) In a product liability action, a manufacturer or seller shall not be liable if: [¶] (1) The product is inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community; and [¶] (2) The product is a common consumer product intended for personal consumption, such as sugar, castor oil, alcohol, *tobacco*, and butter, as identified in comment *i* to Section 402A of the Restatement (Second) of Torts. [¶] (b) For purposes of this section, the term 'product liability action' means any action for injury or death caused by a product, except that the term does not include an action based on a manufacturing defect or breach of an express warranty. [¶] (c) This section is intended to be declarative of and does not alter or amend existing California law, including Cronin v. J.B.E. Olson Corp., (1972) 8 Cal. 3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], and shall apply to all product liability actions pending on, or commenced after, January 1, 1988." (Italics added.)

Plaintiff argues that the Immunity Statute bars only product liability claims and not claims based on fraud. According to plaintiff, a fraud claim is one that challenges the propriety of defendants' conduct, while a product liability claim is one that assails the safety of defendants' products.

The Court of Appeal rejected plaintiff's proposed distinction between fraud and product liability claims as "of no consequence in interpreting [the Immunity Statute], because the Legislature supplied its own expansive definition of . . . 'product liability' actions." As defined by the Legislature in the Immunity Statute, a product liability action is "any action for injury or death caused by a product, except that the term does not include an action based on a manufacturing defect or breach of an express warranty." (Former § 1714.45, subd. (b).) Relying on that language, the Court of Appeal stated: "The Legislature's plain language compels the conclusion that whether based on allegations or theories of fraud, negligence, or manufacture of an inherently unsafe product, an action in which a plaintiff seeks damages for personal injury or death caused by a tobacco product clearly is a 'product liability' action within the meaning of the statute." Thus, the Court of Appeal held, the Immunity Statute bars each of plaintiff's various claims that defendant tobacco companies defrauded the public about the safety of their products and the risks of tobacco use.

We agree with the Court of Appeal that under the Immunity Statute's broad definition of product liability lawsuits, it makes no difference whether a claim seeking damages for "personal injury or death" caused by a tobacco product is labeled as one for negligence, manufacture of an inherently unsafe product, or fraud. But we disagree with the Court of Appeal that the Immunity Statute precludes plaintiff's recovery under all of his fraud allegations.

As we explained in *Richards*, which we discuss at length in the companion case of *Myers, supra*, 28 Cal.4th 828, the Immunity Statute drew "its express inspiration from product liability principles addressed by section 402A of the Restatement Second of Torts (Restatement), and particularly comment *i* thereto (comment *i*)." (*Richards, supra*, 14 Cal.4th at p. 999, citing former § 1714.45, subd. (a)(2).) We observed: "Section 402A of the Restatement proposes generally that when a manufacturer or distributor sells a product 'in a defective condition unreasonably dangerous to the user or consumer' [citation], and the product reaches that person, as expected and intended, without substantial change in its condition, the seller is 'subject to liability' for physical harm 'thereby caused to the ultimate user or consumer.'" (*Richards, supra*, at p. 999, italics deleted.)

We went on to say in *Richards*: "However, comment *i* asserts an important qualification of the general rule . . . . Comment *i* makes clear that, under

the Restatement formulation, '[t]he rule [of liability] applies *only* where the defective condition of the product makes it *unreasonably dangerous* to the user or consumer.' (Restatement, p. 352, italics added.) As comment *i* then explains, '[m]any products cannot possibly be made entirely safe for all consumption,' but if a product is *pure and unadulterated, its inherent or unavoidable danger, commonly known to the community which consumes it anyway*, does not expose the seller to liability for resulting harm to a voluntary user.

"Thus, comment *i* observes, '[o]rdinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture,' but this is not what the Restatement means by 'unreasonably dangerous.' 'Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics . . . . *Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful* . . . . Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks . . . .' (Restatement, pp. 352-353, italics added.)" (*Richards, supra*, 14 Cal.4th at p. 999, some italics added in 1st par.)

*Richards* added: "The clear premise of comment *i* is that no 'liability' arises under the circumstances therein described because *there is no sound basis for liability*. In other words, comment *i* posits, a manufacturer or seller *breaches no legal duty* to voluntary consumers by merely supplying, in an unadulterated form, a common commodity which cannot be made safer, but which the public desires to buy and ingest despite general understanding of its inherent dangers." (*Richards, supra*, 14 Cal.4th at p. 1000.)

Thus, as we explained in *Richards*, the Immunity Statute applied with respect to "*pure and unadulterated*" tobacco products (that is, products whose contents consumers "*desire[] to buy and ingest*"), notwithstanding that the "*inherent or unavoidable danger[s]*" of those products were "*commonly known to the community.*" (*Richards, supra*, 14 Cal.4th at pp. 999-1000, italics added.) Accordingly, the statutory immunity does *not* shield a tobacco company from product liability for injuries or deaths to consumers of its products caused by something not inherent in the product itself—that is, if some adulteration of the product made it unreasonably dangerous.

In this case the trial court, relying on the Immunity Statute, sustained defendants' demurrer to plaintiff's first amended complaint, which included four theories of recovery based on alleged fraud by tobacco companies. For the limited purpose of reviewing that ruling with respect to those four

theories of recovery, we treat the first amended complaint's allegations. as true. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 946 [119 Cal.Rptr.2d 296, 45 P.3d 243].)

The trial court was wrong that the Immunity Statute required it to sustain defendant tobacco companies' demurrer to two causes of action alleged in plaintiff's first amended complaint. In one of these, plaintiff alleges that defendants "manipulat[ed] the addictive properties of cigarettes via . . . *additives*," and in the other he asserts that defendants "control[led] nicotine delivery to the smoker, *through adding ammonia*." The essence of these allegations is that defendant tobacco companies adulterated the cigarettes plaintiff smoked with additives that exposed him to dangers not inherent in cigarette smoking. Because, as we have explained, the statutory immunity does not shield a tobacco company from liability for injuries or deaths caused by something not inherent in the product itself, the Immunity Statute does not bar these claims.

But the trial court was correct to sustain defendant tobacco companies' demurrer to two other fraud claims alleged in plaintiff's first amended complaint, to the extent those claims were based on conduct by tobacco companies during the immunity period. (The concurring and dissenting opinion, however, would allow plaintiff to pursue these two claims.)

The complaint alleges that defendants "control[led] the nicotine content of their cigarettes . . . by developing high-nicotine tobacco and blended tobacco." Because nicotine is naturally present in tobacco, the risks associated with nicotine are inherent in tobacco products. Therefore, an allegation that defendants increased the nicotine content of their cigarettes through blended or high-nicotine tobacco does not avoid the bar of the Immunity Statute because it does not allege that defendants exposed plaintiff to a risk *other than* those inherent in tobacco products.

The state Court of Appeal reached a similar conclusion in *American Tobacco Co. v. Superior Court* (1989) 208 Cal.App.3d 480 [255 Cal.Rptr. 280] (*American Tobacco*), a decision authored by Presiding Justice J. Anthony Kline. Although it observed that the Immunity Statute's protection would not extend to risks caused by "unknown dangerous elements" in a tobacco product (*id.* at p. 490, fn. 5), the Court of Appeal rejected the plaintiffs' contentions in that case that the word "tobacco," as used in the Immunity Statute, applied only to unprocessed tobacco leaves rather than to cigarettes: "The Legislature could not have intended to limit the statute to pure tobacco any more than it intended 'alcohol' [another product listed in the Immunity Statute] to apply only to pure alcohol and not to beer, wine

and other liquors, which are the forms in which alcohol commonly is consumed." (*Ibid.*)

 Plaintiff's first amended complaint further alleges that defendants "lied about the addictive nature of smoking," in "a campaign designed to deceive the public, plaintiff, the government, and others as to the health hazards of smoking." According to the complaint, this deception began before 1969, when the federal government first banned certain cigarette advertising, and it continued after 1969, when defendants "disseminate[d] deceptive, erroneous, misleading and false statements" about the "health hazards" and "addictive nature" of smoking cigarettes. These allegations do not suggest that the cigarettes plaintiff smoked exposed him to dangers other than those inherent in cigarette smoking. Thus, to the extent they pertain to conduct by tobacco companies during the immunity period, these allegations fall squarely within the reach of the Immunity Statute, which, during its effective dates from January 1, 1988, until December 31, 1997, shielded tobacco companies against product liability "for injury or death" caused by pure and unadulterated tobacco products. As this court explained in *Richards*, the Legislature enacted the Immunity Statute to protect manufacturers and sellers of certain inherently dangerous products, including cigarettes, from liability for injuries caused by those products precisely because the Legislature itself had concluded "the public desires to buy and ingest [those products] despite general understanding of [their] inherent dangers." (*Richards, supra,* 14 Cal.4th at p. 1000.)

According to the concurring and dissenting opinion, the Immunity Statute does not bar plaintiff's fraud claim based on allegations that defendant tobacco companies deceived the public about the addictive nature of nicotine because smokers generally were not aware of the specific health risks of cigarette smoking. But in *American Tobacco, supra,* 208 Cal.App.3d 480, decided the year after the Surgeon General issued his report concluding that nicotine is addictive, the Court of Appeal soundly rejected essentially the same argument. It explained: "[T]here is no requirement under [the Immunity Statute] that consumers fully appreciate *all* the risks involved in the use or consumption of [a particular] product[] . . . . [I]t is sufficient if the ordinary consumer knows the product is 'unsafe.' " (*Id.* at p. 490, fn. 5.)

### III

 From January 1, 1988, and lasting through December 31, 1997, California's Legislature, by its enactment of the Immunity Statute, protected tobacco companies from product liability lawsuits by smokers. Here, plaintiff was a cigarette smoker for 46 years (from 1950 through 1996). He argues

that the immunity does not apply to defendants' conduct during the 37 years he smoked *before* January 1, 1988, the effective date of the Immunity Statute. We agree.

As we hold in the companion case of *Myers, supra,* 28 Cal.4th 828, the Immunity Statute governs conduct of tobacco companies during the immunity period, which began on January 1, 1988, and ended on December 31, 1997. But when, on January 1, 1998, the California Legislature's repeal of that immunity took effect, the Legislature restored the common law principles that had, until enactment of the Immunity Statute, governed tort liability against tobacco companies. Thus, the Immunity Statute provides no protection to tobacco companies for conduct that occurred before the statute's 10-year period of immunity.

Regarding defendants' conduct during the statutory immunity period, we conclude that the Immunity Statute bars plaintiff's claims, however labeled, where they allege no more than personal injury caused by dangers or risks inherent in the consumption of tobacco products such as cigarettes. But the Immunity Statute does not bar plaintiff's claims that the defendants adulterated the cigarettes plaintiff smoked with additives that exposed him to dangers not inherent in cigarette smoking. Nor does the Immunity Statute shield tobacco companies from liability for conduct outside the immunity period.

## DISPOSITION

We reverse the judgment of the Court of Appeal and remand to that court for reconsideration of plaintiff's appeal in light of our conclusions here and in the companion case of *Myers.*

George, C. J., Baxter, J., Chin, J., and Brown, J., concurred.

**BROWN, J.,** Concurring.—I agree with the majority that plaintiff's (see maj. opn., *ante,* at p. 861, fn. 3) causes of action alleging defendants manipulated the addictive properties of cigarettes by adding ammonia should survive demurrer. I write separately to express my concern that the majority has extended the immunity of Civil Code section 1714.45 (section 1714.45) only to products that are "pure and unadulterated" (maj. opn., *ante,* at pp. 862, 864-866), imposing a standard that is vague and misleading as well as potentially inconsistent with legislative intent.[1]

Any product processed with one or more additives and thus no longer in its raw or natural state is arguably not "pure and unadulterated"; but that was

---

[1]Although this case arises under former section 1714.45, which included tobacco as one of the "common consumer product[s]" exempted from product liability actions under the

not how we used the term in *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985 [60 Cal.Rptr.2d 103, 928 P.2d 1181] (*Richards*). In *Richards*, the court did not formulate a standard for determining the scope of section 1714.45 immunity but addressed the more fundamental question of the basis for statutory immunity. We explained that "if a product is pure and unadulterated, its inherent or unavoidable danger, commonly known to the community which consumes it anyway, does not expose the seller to liability for resulting harm to a voluntary user." (*Richards*, at p. 999, italics omitted.) As the analysis in *Richards* makes clear, this reference to "pure and unadulterated" must be read with reference to comment *i* of section 402A of the Restatement Second of Torts (Restatement), from which section 1714.45 "draws its express inspiration . . . ." (*Richards*, at p. 999; see § 1714.45, subd. (a)(2).)

Comment *i* qualifies the general rule of liability for unreasonably dangerous products: "Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fuel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous." (Rest., § 402A, com. *i*, pp. 352-353.)

From this explanation, we can reasonably infer that the Legislature did not extend section 1714.45 immunity to products that are contaminated, perhaps through improper storage or transport, or contain some ingredient making them unfit for ordinary consumption. Such contamination, however, is not the same as processing a "pure and unadulterated" product—as by incorporating additives—to make it more palatable or appealing to the consumer.

conditions described (Stats. 1987, ch. 1498, § 3, p. 5778), the majority's standard will apply equally to the current version of section 1714.45, which continues to extend immunity to numerous other products. (See § 1714.45, subd. (a)(2).) This breadth of application makes formulation of the proper standard particularly critical.

In today's high-technology economy, such adulteration is common practice—even in common consumer products one might reasonably assume are "pure and unadulterated" (see, e.g., 7 C.F.R. § 205.605 (2002) [listing several dozen nonsynthetic and synthetic substances that "may be used as ingredients in or on processed products labeled as 'organic' "])—but it does not result in products that would fall outside the immunity of section 1714.45. For example, most wines do not contain "pure and unadulterated" grapes but have sulfites added to discourage bacterial growth as the wine ferments. Sulfur-based preservatives prevent discoloration in the drying of "pure and unadulterated" fruits such as apricots. Nitrites and nitrates preserve flavor and delay the development of toxins when used to cure "pure and unadulterated" meats for bacon and ham. By the same reasoning, consumers generally do not buy unprocessed tobacco but cigarettes, which may contain nontobacco additives that make them more attractive to the consumer. That processing does not *necessarily* make the tobacco adulterated, i.e., contaminated, even if the product is no longer "pure and unadulterated." Thus, to the extent such cigarettes meet consumer expectations, they would not be unreasonably dangerous as contemplated by comment *i* and should come within the statutory immunity.

This conclusion is fully consonant with our reasoning in *Richards*, irrespective of the passing reference to a product that is "pure and unadulterated." As the court went on to explain, "Like comment *i*, section 1714.45 negates 'liab[ility]' to voluntary users for the mere manufacture or sale of 'common consumer product[s] intended for personal consumption,' . . . which are 'inherently unsafe' and are understood to be so by 'ordinary knowledge common to the community,' but which are nonetheless consumed with such ordinary knowledge. Like the Restatement, the statute thus precludes 'liab[ility]' for the furnishing of such products on grounds that *under the circumstances described in the statute,* their 'inherent' dangers do not make them 'defective' when used as intended by voluntary consumers who are aware of the risks . . . . In other words, under the conditions described by section 1714.45, a tobacco supplier simply commits no tort against knowing and voluntary smokers by making cigarettes available for their use." (*Richards, supra,* 14 Cal.4th at p. 1000, italics added, original italics omitted.)

Thus, in *Richards*, we hewed to the statutory language, as informed by the Restatement Second of Torts, section 402A, comment *i*, in defining liability under former section 1714.45. In my view, we should do the same in articulating the scope of the immunity and not engraft a "pure and unadulterated" standard. This is not to say that some additives may not give rise to unique dangers that take a product outside the statutory definition; but we

should not adopt a standard that will potentially sweep too many cases within its ambit. I therefore agree with the majority that plaintiff's action may proceed on the theory that the addition of ammonia or other additives to cigarettes posed some *independent risk* not within the "ordinary knowledge common to the community" about the dangers of tobacco. (Former § 1714.45, subd. (a)(2).) Plaintiff, of course, will have to prove that case.

**WERDEGAR, J., Concurring and Dissenting.**—I agree with the majority that the immunity conferred by Civil Code former section 1714.45 (Stats. 1987, ch. 1498, § 3, p. 5778) (the Immunity Statute) bars plaintiff's claims "where they allege no more than personal injury caused by dangers or risks inherent in the consumption of tobacco products such as cigarettes" (maj. opn., *ante*, at p. 867), insofar as that holding is limited, as the statute requires, to dangers or risks commonly known to the community and to conduct within the immunity period.[1] I further agree that such immunity "does not extend to allegations that tobacco companies, in the manufacture of cigarettes, used additives that exposed smokers to dangers beyond those commonly known to be associated with cigarette smoking." (Maj. opn., *ante*, at p. 861.)

I disagree with the majority that the Immunity Statute does not permit recovery based on plaintiff's allegations that "defendants 'control[led] the nicotine content of their cigarettes . . . by developing high-nicotine tobacco and blended tobacco'" (maj. opn., *ante*, at p. 865) and "'lied about the addictive nature of smoking'" (*id.* at p. 866, quoting the operative first amended complaint). The majority rests here on the assertion that "[t]hese allegations do not suggest that the cigarettes plaintiff smoked exposed him to dangers other than those inherent in cigarette smoking" (*ibid.*; see also *id.* at p. 865), but that is beside the point. The allegations *do* suggest that the cigarettes plaintiff smoked exposed him to dangers beyond those commonly known to be associated with cigarette smoking. They therefore fall outside the Immunity Statute which, as the majority acknowledges, does not extend to such allegations. (Maj. opn., *ante*, at pp. 860-861.)[2]

The Immunity Statute provided in pertinent part that, "(a) In a product liability action, a manufacturer or seller shall not be liable if: [¶] (1) The

[1]The Immunity Statute applied to certain conduct occurring from January 1, 1988, to December 31, 1997 (the immunity period), so that no product liability cause of action may be based on that conduct, regardless of when the users of covered products may have sustained or discovered injuries caused thereby. An amended version of Civil Code section 1714.45, enacted in 1997 (Stats. 1997, ch. 570, § 1), eliminated any immunity for tobacco manufacturers. (See *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 832 [40 Cal.Rptr.2d 123, 50 P.3d 751].)

[2]I agree with the majority that on demurrer "an allegation that defendants increased the nicotine content of their cigarettes through blended or high-nicotine tobacco does not avoid the bar of the Immunity Statute [as part of a theory] that defendants exposed plaintiff to a risk *other than* those inherent in tobacco products." (Maj. opn., *ante*, at p. 865.) As I explain more

product is inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community; and [¶] (2) The product is a common consumer product intended for personal consumption, such as sugar, castor oil, alcohol, tobacco, and butter, as identified in comment *i* to Section 402A of the Restatement (Second) of Torts." (Civ. Code, former § 1714.45, Stats. 1987, ch. 1498, § 3, pp. 5778-5779.)

As the majority acknowledges, in *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985 [60 Cal.Rptr.2d 103, 928 P.2d 1181] (*Richards*) we described the Immunity Statute as "based on the principle that 'if a product is pure and unadulterated, its inherent or unavoidable danger, commonly known to the community which consumes it anyway, does not expose the seller to liability for resulting harm to a voluntary user.' " (Maj. opn., *ante*, at p. 862, quoting *Richards, supra*, 14 Cal.4th at p. 999.) Here, the crux of plaintiff's allegations respecting consumer knowledge at relevant times is that defendants' products posed dangers other than those commonly known to be inherent in cigarette smoking. Thus, plaintiff alleges in detail that defendants carried out a campaign designed to deceive the public, plaintiff, the government, and others as to the health hazards of smoking, including the addictive nature of smoking, to conceal the results of their own research, and to misrepresent their actual role in manipulating the addictive properties of cigarettes via nicotine and other additives.

Plaintiff alleges that defendants conspired to deceive the government and the consuming public (including plaintiff himself) by a variety of means. For example, according to plaintiff, defendants established, funded, and publicized tobacco industry "research" bodies, which they touted as unbiased and trustworthy, and thereafter falsely represented to plaintiff and others that emerging questions about smoking and health would be truthfully answered by these bodies.[3] Defendants also conspired to coordinate their responses to any statements by the Surgeon General or to other governmental action. In furtherance of that conspiracy, plaintiff alleges, defendants "concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of the nicotine content of their products to create and perpetuate smokers' addiction to cigarettes . . . ." Before 1969 (when certain cigarette advertising was banned), defendants placed "deceptive, erroneous, misleading, and false advertisements" in

---

fully below, however, such an allegation *may* avoid the bar of the Immunity Statute as part of a theory that defendants exposed plaintiff to a product not "known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community." (Civ. Code, former § 1714.45, subd. (a)(1), Stats. 1987, ch. 1498, § 3, p. 5778.)

[3]Plaintiff alleges activities by the Tobacco Institute, the Tobacco Industry Research Committee, the Tobacco Research Council, Tobacco Research—U.S.A., Inc., and the Council for Tobacco Research.

all media "designed to conceal the true health hazards and addictive nature of cigarettes and to lure new, especially youthful, users to replace the older ones who died." After 1969, defendants "continued to disseminate deceptive, erroneous, misleading, and false statements concerning the state of the medical research concerning cigarettes and the diseases they cause, as well as the health hazards and addictive nature of cigarettes . . . ." At relevant times, plaintiff also alleges, defendants abused legal processes "to misdirect what purported to be objective scientific research to create favorable, and to suppress unfavorable, findings regarding the health consequences of smoking."

Throughout the immunity period, according to plaintiff, defendants thus aimed "to intentionally frustrate the flow of information from the medical and scientific community to the general public on the health risks and addictive nature of cigarettes." Defendants allegedly "controlled, and continue now to control nicotine content of their cigarettes . . . and engineer their cigarettes to control nicotine delivery to the smoker . . . . They then concealed their knowledge of the addictive nature of nicotine and of their manipulation of nicotine levels and delivery. Defendants have denied, and continue to deny publicly that nicotine is addictive, or that they attempt to or do achieve levels of nicotine in their products to create or sustain addiction." Defendants' well-funded and deceptive public relations campaign, including "literally hundreds of misrepresentations to plaintiff and others over the course of the last 40 years," plaintiff alleges, "resulted in plaintiff being unaware" of "the extent to which smoking presented a serious hazard to his health, [or] that the nicotine therein would addict him to smoking . . . ." Indeed, as has been noted, "The tobacco industry has repeatedly told the public that nicotine is not addictive. Most specifically and most dramatically, at a congressional hearing on April 14, 1994, seven tobacco company CEOs—each in turn—stated that nicotine is not addictive." (Glantz et al., The Cigarette Papers (1996) p. 100.)[4]

In short, plaintiff alleges, "[t]he addictive effect of nicotine has long been known and concealed by the defendants." Despite their secret knowledge, defendants "intentionally conspired to mislead, deceive and confuse the government, and the public, including plaintiff, concerning the harmful and debilitating effects smoking has on the health of individuals, that nicotine in

---

[4]See generally Vladeck, *Defending Courts: A Brief Rejoinder to Professors Fried and Rosenberg* (2001) 31 Seton Hall L.Rev. 631, 635, wherein the author notes that in a recent book former federal Food and Drug Administration Commissioner David Kessler cites evidence obtained in litigation "to make his case that the tobacco industry deceived Congress, regulators, and the American people about the addictive nature of its products and its ability to manipulate the nicotine dose delivered by cigarettes to maintain addiction." (See also Kessler, A Question of Intent: A Great American Battle With a Deadly Industry (2001).)

cigarettes is a powerfully addictive substance, and that defendants intentionally manipulate levels of nicotine delivery in cigarettes to ensure that smokers remain addicted." "One of the goals of the conspiracy," plaintiff alleges, "was to create a false controversy regarding the health hazards of tobacco use and the addictive properties of nicotine in order to protect the market for cigarette sales and the profits of the tobacco industry" defendants. Consequently, plaintiff alleges, despite the availability of some governmental information respecting smoking and addiction, "[a]t times material, the ordinary consumer, including the plaintiff, did not in the exercise of ordinary diligence know of the likelihood of, the severity of, or the risks from" cigarettes.

Plaintiff thus plainly alleges *more* than "personal injury caused by dangers or risks inherent in the consumption of tobacco products such as cigarettes" (maj. opn., *ante*, at p. 867); he alleges that defendants secretly manipulated the nicotine content of cigarettes to enhance their addictive properties, thus subverting the "ordinary knowledge common to the community," and materially misled the ordinary consumer about cigarettes' addictiveness. (Cf. Civ. Code, former § 1714.45, subd. (a)(1), Stats. 1987, ch, 1498, § 3, p. 5778.)

It is a "fundamental premise" of the Immunity Statute that it negates liability only to "knowing and voluntary consumers" of covered products and then only when the conditions described in the statute—including the condition that "the product is known to be unsafe by the ordinary consumer"—obtain. (*Richards, supra,* 14 Cal.4th at p. 1000.) The majority not only acknowledges the point (maj. opn., *ante*, at p. 862), but relies on it to conclude that plaintiff's allegations concerning additives fall outside the Immunity Statute (see *id.* at p. 864). But there is no principled way to distinguish for these purposes between plaintiff's allegations that defendants secretly used additives and his allegations that defendants secretly manipulated and lied about the addictiveness of their product. Both activities allegedly "exposed smokers to dangers beyond those commonly known to be associated with cigarette smoking" (maj. opn., *ante*, at p. 861); therefore, both fall outside the Immunity Statute.

The majority apparently takes the view that the Legislature in the Immunity Statute declared the dangers of cigarettes to be commonly known as a matter of law. (See, e.g., maj. opn., *ante*, at pp. 861-862.) In support, the majority asserts that in *Richards, supra,* 14 Cal.4th at page 1000, we "explained" that the Legislature itself had concluded that tobacco products automatically qualify for immunity because there existed " '*general understanding of* [*their*] *inherent dangers.*' " (Maj. opn., *ante*, at p. 866, italics added.) But that is not what the Immunity Statute says, nor is it the import of what we said in *Richards*.

On its face, the Immunity Statute mentions tobacco (along with sugar, castor oil, alcohol, and butter) only *conditionally*, as a consumer product that *might* qualify for immunity if certain other, separately specified, requirements are met. Thus, tobacco appears in a list of examples of "common consumer product[s] intended for personal consumption" (Civ. Code, former § 1714.45, subd. (a)(2), Stats. 1987, ch. 1498, § 3, p. 5778) that qualify for immunity if, but only if, they meet the requirements set out in subdivision (a)(1), a separate part of the statute. Subdivision (a)(1) requires that any common consumer product proposed for immunity be "inherently unsafe *and* . . . known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community." (Italics added.)

When noting in *Richards* that tobacco was specifically included in the Immunity Statute's list of inherently unsafe "common consumer product[s]," we also carefully noted, in fealty to the statute's plain language, that the statute precludes liability only "under the circumstances described in the statute" (*Richards, supra*, 14 Cal.4th at p. 1000)—including, of course, the circumstance that "the product is known to be unsafe by the ordinary consumer" (Civ. Code, former § 1714.45, subd. (a)(1), Stats. 1987, ch. 1498, § 3, p. 5778).

Even if, as the majority asserts, and contrary to the statute's plain language, the Legislature in enacting the Immunity Statute intended to deem, as a matter of law, that the consuming public had a " 'general understanding' " of tobacco's inherent dangers (maj. opn., *ante*, at p. 866), any such intent logically could have encompassed at the most only those dangers of tobacco that had been publicly reported by the time the Immunity Statute was enacted in 1987. But in the period leading up to and at the outset of the immunity period, the predominant public document informing consumers about the addictiveness of tobacco was the Surgeon General's 1964 Report on Smoking and Health (Surgeon Gen. Advisory Com. Rep., Smoking and Health (1964) (1964 Report)). Significantly, that report concluded that tobacco use "should be characterized as an habituation *rather than an addiction*." (*Id.*, ch. 4, p. 34, italics added.) The 1964 Report actually *minimized* the health hazards of nicotine in cigarettes, arguing that "the chronic toxicity of nicotine in quantities absorbed from smoking and other methods of tobacco use is very low and probably does not represent an important health hazard." (*Id.*, ch. 4, p. 32.)

Not until 1988, one year *after* the Immunity Statute was enacted, did the Surgeon General state unequivocally that cigarettes and other forms of tobacco are addicting and that nicotine is the drug in tobacco that causes

addiction. (See Centers for Disease Control and Prevention, Dept. Health & Human Services, The Health Consequences of Smoking: Nicotine Addiction (1988); see also www.cdc.gov/tobacco/sgrpage.htm [as of Aug. 5, 2002].) Moreover, that the delivery to Congress in 1988 of a medical report on tobacco's addictiveness conferred on either the California Legislature or California consumers a general understanding of tobacco's addictive properties does not necessarily follow. In any event, since neither the public nor the Legislature could possibly have known about dangers of tobacco use that were discovered or disclosed only *after* the Immunity Statute was enacted, the Legislature cannot have intended to bar suits based on such dangers.

Contrary to the majority's implication, the *addictive* property of a substance is qualitatively different from mere "health risks" attendant upon its ingestion. (See maj. opn., *ante*, at p. 866, citing *American Tobacco Co. v. Superior Court* (1989) 208 Cal.App.3d 480 [255 Cal.Rptr. 280].) As discussed, plaintiff alleges that, as a consequence of defendants' misleading conduct, he and other ordinary consumers did *not* during the immunity period appreciate the relevant risks, specifically the risk of addiction, involved in the use or consumption of tobacco. Moreover, once an individual is addicted to a substance, that individual arguably cannot reasonably be deemed a voluntary consumer. Consequently, *American Tobacco*, a Court of Appeal decision issued only at the outset of the immunity period and five years before the bombshell disclosures about tobacco companies' behavior on which plaintiff's allegations largely are based (see Glantz et al., The Cigarette Papers, *supra*, p. xvii), is of no persuasive value.

The majority improperly denies plaintiff an opportunity to attempt to demonstrate the truth of his allegations respecting the consuming public's knowledge at relevant times. (Maj. opn., *ante*, at pp. 865-866.) Plaintiff's allegations may or may not ultimately be provable, of course, but on review of a grant of demurrer their provability is not relevant since we assume them to be true. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 946 [119 Cal.Rptr.2d 296, 45 P.3d 243]; see also *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1177 [32 Cal.Rptr.2d 1, 876 P.2d 487]; maj. opn., *ante*, at pp. 864-865.) Since the Immunity Statute cannot apply if plaintiff's allegations are true, the majority is mistaken in concluding as a matter of law that the Immunity Statute does not permit recovery based on these allegations. From that conclusion I respectfully dissent.

Moreno, J., concurred.