[No. E051218. Fourth Dist., Div. Two. July 11, 2012.]

JAMES RUSSELL COLLINS, Plaintiff and Appellant, v.
UNION PACIFIC RAILROAD COMPANY, Defendant and Appellant.

868

## Counsel

William J. Brown III and John T. Richards for Plaintiff and Appellant.

Bradley & Gmelich, Thomas P. Gmelich, Lena J. Marderosian and Robert A. Crook for Defendant and Appellant.

## Opinion

**RAMIREZ, P. J.**—James Russell Collins, plaintiff, was an employee of Hulcher Services, Inc. (Hulcher), a contractor hired by railroads to clear tracks and rerail train cars following derailments. Following a collision involving two Union Pacific Railroad Company (Union Pacific or defendant) trains, Hulcher responded to the derailment site. Plaintiff, a member of the Hulcher crew, was injured when a block from a Hulcher crane fell on his head. Plaintiff filed a workers' compensation claim against Hulcher, and later filed a complaint for damages against Union Pacific, under the federal Employers' Liability Act (45 U.S.C. § 51 et seq.) (FELA), on the theory that plaintiff was a "special employee." Plaintiff was awarded $3,945,493.93 in damages against Union Pacific, which was reduced to $2,695,493.93 by way of remittitur. Both Union Pacific and plaintiff appeal.[1]

On appeal, Union Pacific argues (1) plaintiff was barred from recovering both workers' compensation benefits and FELA damages; (2) there is insufficient evidence to support the finding that plaintiff was a "special employee" of Union Pacific; and (3) the trial court erred in reducing the workers' compensation lien to pay attorney fees. On cross-appeal, plaintiff argues that the trial court erred by (1) conditionally granting Union Pacific's motion for new trial on the ground of excessive damages and (2) reducing the amount of judgment to reflect a setoff in the amount of the workers' compensation lien, which had been assigned to defendant, thereby denying plaintiff interest on the amount of the lien.[2] We affirm.

---

[1] The parties stipulated to a dismissal of the appeal on the day before the matter was initially set for oral argument based on a proposed settlement. We rejected the stipulation and recalendared oral argument because we determined that the reasons of the parties for requesting dismissal and vacating the trial court judgment did not outweigh the erosion of public trust that may result from the nullification of the judgment and the risk that it would reduce the incentive for pretrial settlement. (Code Civ. Proc., § 128, subd. (a)(8)(A), (B), superseding *Neary v. Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119]; see *City of Palmdale v. Board of Equalization* (2012) 206 Cal.App.4th 329, 338 [141 Cal.Rptr.3d 719].)

[2] In his opening brief on the cross-appeal, plaintiff had included an argument challenging the trial court's in limine ruling excluding evidence of medical expenses in excess of those actually paid. However, following the California Supreme Court's decision in *Howell v. Hamilton Meats & Provisions* (2011) 52 Cal.4th 541 [129 Cal.Rptr.3d 325, 257 P.3d 1130], plaintiff withdrew that issue.

## BACKGROUND

Late at night on September 7, 2003, two Union Pacific freight trains collided near Beaumont, causing the derailment of more than 20 cars. Hulcher, a company which provides rerailment and derailment cleanup services, was contacted, along with another contractor. At the site of the derailment, a chemical smell was detected, raising concerns about a hazardous material (hazmat) spill, so law enforcement barricaded the roads leading to the site. For this reason, Hulcher's heavy equipment was directed to an area one and one-half miles east of the derailment site where they could assemble their equipment while waiting for the hazardous material team to investigate. The area where the equipment was assembled is referred to as the staging area. On this occasion, the staging area was located approximately 75 yards past a freeway off-ramp, on a small side street next to the freeway off-ramp, which intersected with San Timoteo Canyon Road.

Hulcher was directed by Union Pacific to bring two 988 end-loaders and two modified 583 sideboom pipelayers. Plaintiff was with the 988's. Because the equipment is too wide and too heavy to drive on a public street, Hulcher had to obtain permits to move the sidebooms and loaders from the Hulcher facility to the staging area. The sidebooms had to be transported in sections and reassembled at the staging area due to their size and the damage they might cause to asphalt.

A 583 sideboom has an A-frame pole on one side with two cables running through a block and tackle. One cable controls the boom, allowing it to be raised and lowered, and the second cable goes through the block and tackle, controlling the up-and-down movement of the hook. To lower the boom, the brake must be released simultaneously with the boom to prevent tension from building up on the block and tackle assembly. The sideboom could pick up a derailed train car and rerail it.

At approximately 4:30 or 5:00 a.m. on September 8, 2003, the hazmat and fire officials gave the okay for the heavy equipment to come down to the derailment site, and Union Pacific informed Hulcher of the release. The operators of the heavy equipment proceeded down San Timoteo Road when a power pole and power lines spanning the road were spotted. The first 583 lowered its boom and proceeded under the power line and cleared it. The second sideboom then proceeded, with plaintiff guiding and directing it under the power line. When the second boom lowered, the block came loose and fell, striking plaintiff on the head.

Plaintiff suffered a fractured jaw, extensive facial laceration, cerebral bleeding (which was resolved prior to discharge from the hospital), multiple

fractures of the face near the nose with mouth displacement, swelling of the sinuses at the front of the head and base of the skull, a punctured lung, and soft tissue swelling of the throat which required a tracheostomy. Plaintiff's jaw was surgically rebuilt in staged surgeries, with bone grafts from his hip, and he suffered from cognitive deficits after the accident. Plaintiff suffered 8 percent impairment from the brain injury and was determined to suffer a permanent partial disability.

Plaintiff was out of work, recovering from his injuries, from September 2003 to January 2004. He was in pain and confused, and questioned his ability to plan or make decisions as he could not track exactly what was going on when he gave directions. Because he had difficulty with sleep, his doctor prescribed Ambien, which prevented him from being on call for eight hours.[3] Hulcher gave plaintiff an ultimatum to either take the medication and go on leave of absence, or to stop taking the medication, so plaintiff went on medical leave in 2006, approximately two years after returning to work. Plaintiff remained out of work until 2008, when he got a job working at White's Steel as a crane operator. However, he was fired eight months later, because a drug test was positive for prescription medication after he blew out a tire on a crane. As a result, plaintiff stopped taking all pain medication and moved to Texas to stay with family. At the time of trial, plaintiff was working as a crane operator in Texas, earning less than he did when he was employed by Hulcher.

A California Occupational Safety and Health Appeals Board investigation concluded that the equipment was not maintained in a safe manner to prevent it from loosening and falling. One of the likely causes of the incident was the failure of the operator of the 583 sideboom to slack the line as he lowered the boom, causing tension and pulling the tail of the cable through the block.

On June 27, 2006, plaintiff filed an action for damages against Union Pacific, under the FELA. Trial was bifurcated. Following the liability portion of the bifurcated jury trial, special verdicts were rendered in favor of plaintiff. Specifically, the jury found (1) Union Pacific had the right to control the work of plaintiff and his fellow Hulcher coworkers at the time of plaintiff's injury; (2) Union Pacific was negligent under the FELA; and (3) plaintiff was not negligent.

During the damages portion of the trial, plaintiff's expert, who treated plaintiff and prepared a report in 2003, described the severity of plaintiff's injury and the continuing problems he experienced during his recovery.

---

[3] Managers take calls whenever a derailment occurs, and may be awakened during sleep with a call regarding a derailment.

Plaintiff's expert described the brain injury as severe. In his opinion, plaintiff required continuing treatment in the form of a vocational rehabilitation team as well as a neuropsychologist to evaluate his cognitive skills and provide therapy. The cost of such programs was estimated at $100,000. However, at his most recent evaluation of plaintiff, he noted that plaintiff denied any cognitive complaints and was not currently receiving medical attention due to financial limitations and plaintiff's work schedule. Another doctor who treated plaintiff noted in 2007 that plaintiff had no cognitive or neurological deficit.

A defense expert evaluated plaintiff in 2010. Although he found some residual problems from the facial and other physical injuries, and while he determined it was reasonable to conclude plaintiff had suffered trauma to his head and face, he characterized the injury as mild traumatic brain injury. His diagnosis was based on the fact that someone with moderate to severe brain injury would not be able to maintain gainful employment. He also explained that plaintiff's expert had conducted tests within five weeks of plaintiff's trauma when plaintiff was still on narcotic pain medication.

Following the damages portion of the trial, the jury determined that plaintiff should recover (a) lost earnings in the amount of $132,583.33; (b) past medical expenses of $137,910.60; (c) future lost earnings of $75,000; (d) future medical expenses of $100,000; (e) past noneconomic loss (pain and suffering) of $1.75 million; and (f) future noneconomic loss of $1.75 million, for total damages in the amount of $3,945,493.93.

On May 12, 2010, Union Pacific filed motions for a new trial based on excessive damages, as well as a motion for judgment notwithstanding the verdict challenging the jury's finding that plaintiff was a borrowed servant. Union Pacific also made a motion to amend the judgment to reflect a setoff of $205,195.16 against the damage award, for the workers' compensation lien which Hulcher assigned to Union Pacific.

The court granted the motion for new trial on damages, subject to the condition that the motion for new trial would be denied if plaintiff consented to a reduction. The court determined that plaintiff's expert overemphasized the injury and its effect on plaintiff. The court determined that the award of noneconomic damages was excessive, and should be reduced to $1 million. The court reduced the award for future noneconomic damages to $1.25 million. The motion for judgment notwithstanding the verdict was denied, but the court ordered that the damages be offset by the amount of the workers' compensation lien. The final judgment reflected that plaintiff would recover net damages in the amount of $2,558,826.93, plus interest, after being reduced by the amount of the lien, which in turn was reduced by $68,333 for attorney fees pursuant to Labor Code section 3856.

On July 9, 2010, plaintiff accepted the remittitur. Union Pacific and plaintiff each appealed.

## DISCUSSION

*Union Pacific's Appeal*

1. *Whether Plaintiff's Recovery of Workers' Compensation Benefits Precluded Recovery Under FELA.*

Defendant, Union Pacific, argues that the remedies provided by Labor Code section 3602, are the exclusive remedies for an injured employee, even if one is determined to be a "dual employee." Thus, it argues, as a special employee, plaintiff was barred from recovering damages against either employer. We disagree.

■ Labor Code section 3602 provides that where the conditions of compensation set forth in section 3600 concur, the right to recover compensation is the sole and exclusive remedy of the employee against the employer, and the fact that the employee also occupied another or dual capacity at the time of the injury shall not permit the employee to bring an action at law for damages against the employer. (Lab. Code, § 3602, subd. (a); *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 986 [105 Cal.Rptr.2d 88].) Under the statutory scheme, an employee injured in the workplace may request workers' compensation benefits for medical treatment and other services reasonably required to cure or relieve the employee from the effects of the injury. (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 810 [102 Cal.Rptr.2d 562, 14 P.3d 234].)

■ In determining whether exclusivity bars a cause of action against an employer, courts determine whether the alleged injury falls within the scope of the exclusive remedy provisions, or whether the injury is collateral to or derivative of an injury compensable by the exclusive remedies of the Workers' Compensation Act (WCA) (Lab. Code, § 3200 et seq.). (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund, supra,* 24 Cal.4th at p. 811.) Importantly, the existence of a workers' compensation remedy does not by itself establish that the remedy is exclusive. (*City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1154 [77 Cal.Rptr.2d 445, 959 P.2d 752].) Rather, the scope of workers' compensation exclusivity depends on the terms of the exclusive remedy provisions. (*Ibid.*)

■ It is undisputed that Hulcher was plaintiff's general employer, but this fact does not preclude a finding that defendant was plaintiff's special employer and does not answer the question of whether defendant may rely on

the doctrine of exclusivity. An employee may at the same time be under a general and a special employer, and where, either by the terms of a contract or during the course of its performance, the employee of an independent contractor comes under the control and direction of the other party to the contract, a dual employment relation is held to exist. (*Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174 [51 Cal.Rptr. 671, 588 P.2d 811].) If general and special employment exist, the injured workman can look to both employers for workers' compensation benefits, and, if workers' compensation is available, it constitutes the worker's sole remedy against the employer. (*Id.* at p. 175.) Our resolution of this issue is interdependent with our determination of the "borrowed servant" issue in the next section.

■ California injured employees are generally entitled to workers' compensation benefits (Lab. Code, § 3200 et seq.), but those benefits are *not* available to *railroad* employees who suffer on-the-job injuries; their right of recovery is governed by the FELA. (*Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 6 [1 Cal.Rptr.3d 412, 71 P.3d 770].) A FELA action may be brought in either federal or state court. (*Lund*, at p. 6; see *Kinsey v. Union Pacific Railroad Co.* (2009) 178 Cal.App.4th 201, 204 [100 Cal.Rptr.3d 253].) Where a plaintiff is found to be a special employee of a railroad, he may bring an action under FELA to recover for his injuries from the railroad company notwithstanding the fact he sought workers' compensation benefits from his general employer. (See *Kelley v. Southern Pacific Co.* (1974) 419 U.S. 318, 321 [42 L.Ed.2d 498, 95 S.Ct. 472].)

In *Kelley v. Southern Pacific Co., supra*, 419 U.S. 318, the plaintiff was an employee of a trucking company who was injured while transferring automobiles in the railroad company's rail yard. The plaintiff had recovered workers' compensation benefits from the general employer, and brought an action against the railroad under the FELA. While the court did not address the exclusivity of workers' compensation benefits in the dual employment context, its remand of the matter to the lower court for further consideration of the legal standard applicable under the FELA suggests there was no procedural bar to recovery under FELA.

More on point is *DeShong v. Seaboard Coast Line R.R.* (1984) 737 F.2d 1520, in which a truck driver recovered workers' compensation benefits from his direct employer under Florida's statutory scheme, and brought an action against the railroad under the FELA. The railroad sought and obtained summary judgment on the ground the plaintiff was estopped from recovering against it after obtaining workers' compensation benefits. That judgment was reversed by the Eleventh Circuit Court of Appeals, which relied on *Kelley v. Southern Pacific Co., supra*, 419 U.S. 318, finding the plaintiff could establish his employment with the rail carrier, even while nominally employed

by another, for purposes of bringing a FELA action, notwithstanding the fact he had received workers' compensation benefits through his primary employer. (*DeShong*, at p. 1523, fn. 6.)

As indicated earlier, where general and special employment exist, a plaintiff may look to both employers for workers' compensation benefits, if available. Here, they were available only with respect to the general employer, and not with respect to the defendant railroad. Plaintiff's acceptance of workers' compensation benefits did not constitute a binding election of remedies which would bar a subsequent recovery under FELA, subject to credit for the prior recovery. (See *Freeman v. Norfolk & Western Ry.* (1979) 596 F.2d 1205, 1208.) This result does not create a special class of employees who are entitled to double recovery, as defendant suggested at oral argument. As the Circuit Court of Appeal observed in *Freeman*, any benefits received under the workers' compensation statutes would be credited against an FELA award. (*Freeman*, at p. 1208; see *Artis v. Norfolk & Western Ry.* (2000) 204 F.3d 141, 144, citing *Freeman*, at p. 1208.)

■ The court did not err in determining that plaintiff could seek recovery against the railroad under FELA after accepting workers' compensation benefits through his general employer.

2. *Whether Plaintiff Was a Special or Borrowed Employee of Union Pacific.*

Defendant argues there was insufficient evidence to support the jury's finding that defendant had a right to control the details of plaintiff's work such that plaintiff could be considered a "special employee" or a "borrowed servant." We disagree.

The question of whether a special employment relationship exists is generally a question of fact reserved for the jury. (*Wedeck v. Unocal Corp.* (1997) 59 Cal.App.4th 848, 857 [69 Cal.Rptr.2d 501].) Because the appeal challenges the jury's finding of fact, we are bound by the substantial evidence standard of review. Consequently, we have no authority to second-guess the conclusion reached by the fact finder; instead, the determination that a person is an employee or independent contractor must be affirmed if supported by substantial evidence. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 78 [89 Cal.Rptr.3d 34].)

■ FELA provides that a covered railroad is liable for negligently causing the injury or death of any person while he is employed by the railroad. (45 U.S.C. § 51.) In *Kelley v. Southern Pacific Co., supra,* 419 U.S. at page 324, the United States Supreme Court identified three methods by which

a plaintiff can establish his "employment" with a rail carrier for FELA purposes, even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. Second, he could be deemed to be acting for two masters simultaneously. In order to be deemed a special or borrowed employee, the special employer must play a significant supervisory role over the work of the injured person in the particular operation being performed at the time of the injury. Third, he could be a subservant of a company that was in turn a servant of the railroad. (419 U.S. at p. 324.)

■ Where an independent contractor carries out operational activities of the railroad, it is deemed an agent of the railroad. (*Sinkler v. Missouri Pacific R. Co.* (1958) 356 U.S. 326, 331–332 [2 L.Ed.2d 799, 78 S.Ct. 758].) When the nominal employer furnishes a third party with " 'men to do the work and places them under his exclusive control in the performance of it, [then] those men become *pro hac vice* the servants of him to whom they are furnished,' " under the loaned servant doctrine. (*Shenker v. Baltimore & Ohio R. Co.* (1963) 374 U.S. 1, 5–6 [10 L.Ed.2d 709, 83 S.Ct. 1667], quoting *The Standard Oil Co. v. Anderson* (1909) 212 U.S. 215, 221 [53 L.Ed.480, 29 S.Ct. 252].)

■ The determination of whether a worker is a borrowed servant is accomplished by ascertaining who has the power to control and direct the servants in the performance of their work, distinguishing between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking. (*Linstead v. Ches. & Ohio Ry.* (1928) 276 U.S. 28, 34 [72 L.Ed. 453, 48 S.Ct. 241].) There is thus a distinction between "authoritative direction and control" by a railroad, and the "minimum cooperation necessary to carry out a coordinated undertaking" which does not amount to control or supervision. (*Shenker v. Baltimore & Ohio R. Co., supra,* 374 U.S. at pp. 5–7.) The control need not be exercised; it is sufficient if the right to direct the details of the work is present. (*Wedeck v. Unocal Corp., supra,* 59 Cal.App.4th at p. 859.)

In the present case, the jury heard testimony from both Hulcher and Union Pacific employees describing the working relationship of Hulcher employees vis-à-vis Union Pacific derailments. Hulcher employees were required to follow Union Pacific safety rules. Union Pacific supervised work at the derailment site. A Union Pacific supervisor or manager could tell a Hulcher employee to stop doing something if something was being done unsafely. He could also tell a Hulcher manager to remove a Hulcher employee. On one occasion, a Union Pacific supervisor told a Hulcher manager to get rid of another Hulcher manager who refused to give workers a two-hour break with

food and water when working in El Centro in the heat. Union Pacific would order the type of equipment it wanted Hulcher to bring to a particular derailment. Union Pacific told Hulcher what work it wanted done (whether to rerail or remove cars).

Union Pacific surveyed the area to determine what hazards were present and would mark potentially dangerous power lines. If proper clearance was not possible, Union Pacific would have the power shut off or have the lines dropped. When working on a specific rerailment, Union Pacific met with Hulcher managers to plan the work. Also, Union Pacific would explain any safety hazards. Hulcher must seek Union Pacific approval before bringing equipment down to the derailment site and must follow Union Pacific's directions at the site.

Additionally, by contractual agreement, Union Pacific was responsible for facilitating Hulcher's ingress and egress at a derailment site, indemnifying Hulcher against any property damage that might be caused by heavy equipment traversing private property. This required Hulcher to obtain approval from Union Pacific of the intended route to the derailment before crossing through public or private property. Although Union Pacific did not tell Hulcher employees how to operate their equipment, it could and would tell a Hulcher crew what it wanted done and how to do it. A Union Pacific supervisor might give signals or directions to Hulcher employees directing them in the operation of Hulcher equipment.

Reviewing the evidence in the light most favorable to the judgment, there is substantial evidence to support the jury's finding that Union Pacific had the right to control the work of plaintiff and the coworker whose negligence caused the accident at the time of plaintiff's injury.

3. *Whether the Court Properly Reduced the Workers' Compensation Lien to Pay for Attorney Fees*

Defendant argues that the lower court erred in deducting attorney fees from the amount of the workers' compensation lien. We disagree.

■ Labor Code section 3852 provides that the claim of an employee pursuant to the WCA for compensation does not affect his or her claim or right of action for all damages resulting from the injury or death against any person other than the employer. Labor Code section 3856, subdivision (b), provides that in the event of suit against a third party by an employee, the court shall first order paid from any judgment for damages recovered the reasonable litigation expenses incurred in preparation and prosecution of such action, together with a reasonable attorney fee which shall be based solely

upon the services rendered by the employee's attorney in effecting recovery both for the benefit of the employee and the employer.

■ Labor Code section 3856 governs the allocation between the employee and the employer of a judgment obtained against a negligent third party. (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 30 [65 Cal.Rptr.2d 360, 939 P.2d 760].) Where third parties were responsible in tort for the employee's injuries, the employer may seek recoupment of benefits paid or owed to the employee, either by suing such third parties directly, or by asserting a lien or credit against any tort recovery by the employee.[4] (*Richards v. Owens-Illinois, Inc., supra*, 14 Cal.4th at p. 994.) This prevents an employee from retaining both the third party damages *and* workers' compensation benefits for the same injuries and disabilities. (*Engle v. Endlich, supra*, 9 Cal.App.4th at pp. 1164–1165.) This section requires that a workers' compensation lien be satisfied out of the judgment and not the verdict. (*Manthey v. San Luis Rey Downs Enterprises, Inc.* (1993) 16 Cal.App.4th 782, 789 [20 Cal.Rptr.2d 265].)

■ An employer may assign to the defendant its right to reimbursement of workers' compensation benefits paid to the plaintiff, and the defendant will step into the shoes of the employer for all purposes. (*Crampton v. Takegoshi* (1993) 17 Cal.App.4th 308, 318 [21 Cal.Rptr.2d 284] overruled on another point in *Phelps v. Stostad, supra*, 16 Cal.4th at p. 34; see *Engle v. Endlich, supra*, 9 Cal.App.4th at p. 1164.) Thus, an employer that has paid workers' compensation benefits to the injured employee has a right to lien that portion of the judgment representing the amount it has expended under Labor Code section 3856. (*Kindt v. Otis Elevator Co.* (1995) 32 Cal.App.4th 452, 456 [38 Cal.Rptr.2d 121].) This section also provides for the payment of litigation expenses and attorney fees and for reimbursement to the employer for the amount paid for workers' compensation benefits. (*Ibid.*)

The employee is entitled to attorney fees unless there has been active participation by the intervener. (*Kindt v. Otis Elevator Co., supra*, 32

---

[4] However, if the employer itself was even slightly at fault for the injury, its recoupment of benefits is entirely precluded. (*Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, 994 [60 Cal.Rptr.2d 103, 928 P.2d 1181], citing *Roe v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 884, 889 [117 Cal.Rptr. 683, 528 P.2d 771].) A concurrently negligent employer is barred from reimbursement for any compensation benefits. (*Engle v. Endlich* (1992) 9 Cal.App.4th 1152, 1160 [12 Cal.Rptr.2d 145].) The issue of the employer's contributory negligence is a matter of defense, although it is not necessary for the defendant to cross-complain in order to assert this defense. (*C.J.L. Construction, Inc. v. Universal Plumbing* (1993) 18 Cal.App.4th 376, 385, 387–388 [22 Cal.Rptr.2d 360]; *Tate v. Superior Court* (1963) 213 Cal.App.2d 238, 247–248 [28 Cal.Rptr. 548].) Nevertheless, some determination of comparative fault on the part of the employer is required. (*Engle*, at p. 1162.) Because there was no jury determination that the employer was partially at fault, we do not need to address this point.

Cal.App.4th at p. 460.) If the action is prosecuted by the employee alone, a reasonable attorney fee based upon the services rendered by the employee's attorney in effecting recovery both for the benefit of the employee and the employer is allowed, and shall be first paid from the judgment; the lien is to be satisfied only after such payment. (Lab. Code, § 3856, subd. (b); *Draper v. Aceto* (2001) 26 Cal.4th 1086, 1092 [113 Cal.Rptr.2d 61, 33 P.3d 479]; see *Eldridge v. Truck Ins. Exchange* (1967) 253 Cal.App.2d 365, 366 [61 Cal.Rptr. 347].)

The trial court did not err in awarding attorney fees, payable out of the lien amount.

*Plaintiff's Appeal*

> 4. *Whether the Trial Court Properly Granted Union Pacific's Motion for New Trial Unless Plaintiff Agreed to a Remittitur.*

Plaintiff argues in his cross-appeal that the trial court erroneously granted defendant's motion for new trial on the ground of excessive damages. Defendant responds that plaintiff waived his right to challenge the reduced damage award by accepting the remittitur. Normally, when the plaintiff has consented to a remittitur he cannot thereafter appeal on any inseverable issue. (*Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 343 [126 Cal.Rptr. 731].) However, when a plaintiff accepts a remittitur and the defendant appeals, the case is in a different posture and the plaintiff cannot be held to have waived his right to appeal. (*Ibid.; Rosenau v. Heimann* (1990) 218 Cal.App.3d 74, 77 [267 Cal.Rptr. 20]; see *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 918 [148 Cal.Rptr. 389, 582 P.2d 980].) We now turn to the merits.

When a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order. (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 932.) The order will not be reversed unless it plainly appears that he abused his discretion, and the cases teach that when there is a material conflict of evidence regarding the extent of damage the imputation of such abuse is repelled, the same as if the ground of the order were insufficiency of the evidence to justify the verdict. (*Id.* at p. 933.) The reason for this is that the trial court, in ruling on the motion, sits not in an appellate capacity but as an independent trier of fact. (*Ibid.*)

 Misconduct by counsel in closing argument can constitute prejudicial error entitling the aggrieved party to reversal of the judgment and a new

trial, under Code of Civil Procedure section 657, subdivision 1. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802 [16 Cal.Rptr.3d 374, 94 P.3d 513].) The fact that defendant's counsel failed to take timely exception did not preclude the court from granting a new trial on the ground of misconduct, although such error would be considered forfeited if the motion had been denied. (*Neal v. Montgomery Elevator Co.* (1992) 7 Cal.App.4th 1194, 1198 [9 Cal.Rptr.2d 497], citing *Seimon v. Southern Pac. Transportation Co.* (1977) 67 Cal.App.3d 600, 605 [136 Cal.Rptr. 787].)

In the present case, the trial court, sitting as the 13th juror determined that the award for noneconomic damages was excessive and resulted from plaintiff's counsel's improper arguments to the jury. The trial court's written decision focused on the fact that plaintiff's expert, a neuropsychologist, had overemphasized the effect of plaintiff's injury. The record supports this conclusion where the expert treated plaintiff during the earlier phase of his treatment and recovery when the injuries were most acute. Years later, plaintiff's condition had improved to the point where he was able to work full time, and suffered no cognitive or neurological deficits.

As to the portion of the motion addressed to misconduct by counsel, the court's conclusion was a reasonable exercise of discretion. Plaintiff had argued to the jury that when it speaks through its verdict, it resonates, and that in awarding damages to plaintiff, it would be telling the railroad it was not safe. Plaintiff's counsel then argued that the jury is empowered to "make that change." Later, plaintiff's counsel invited the jury to make a "surrogate victim analysis." Counsel argued that the jury should consider its decision by imagining an ad in the newspaper seeking a surrogate victim, someone who would come in to have the same type of injury as the plaintiff; counsel asked the jury to consider what fee would compensate for that injury.

Counsel's "surrogate victim" argument was a "golden rule" argument. A "golden rule" argument is one where counsel asks the jury to place itself in the victim's shoes and award such damages as they would charge to undergo equivalent pain and suffering. (See *Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th at p. 797, citing *Beagle v. Vasold* (1966) 65 Cal.2d 166, 182 [53 Cal.Rptr. 129, 417 P.2d 673].) Counsel's argument that the jury should send a message to the railroad was an invitation to award punitive damages, or to base its calculation of compensatory damages on sympathy for the plaintiff or prejudice against the defendant. Deliberate attempts by counsel to appeal to the social or economic prejudices of the jury are misconduct, where irrelevant to the issues of the case. (*Hoffman v. Brandt* (1966) 65 Cal.2d 549, 552–553 [55 Cal.Rptr. 417, 421 P.2d 425]; see *Seimon v. Southern Pac. Transportation Co., supra,* 67 Cal.App.3d at p. 606.)

■ A jury must impartially determine pain and suffering damages based upon evidence specific to the plaintiff; a "golden rule" argument is improper. (*Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764–765 [70 Cal.Rptr.2d 571].) Appeals to the passions or prejudices of the jury are improper and may justify a determination by the trial court that the damages are excessive. (See *Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 932.)

Plaintiff did suffer a severe injury to his face and jaw, along with a concussion. However, the prognosis provided by plaintiff's psychological expert was based on an assumption that the traumatic brain injury was severe, a diagnosis not supported by plaintiff's own neurologist, who determined that plaintiff showed no cognitive dysfunction or neurologic deficit. According to the neurologist who conducted the independent medical examination, the fact that the cerebral bleeding was minimal, and resolved within days, suggested plaintiff suffered a mild brain trauma.

Plaintiff's neurologist reported that plaintiff suffered 8 percent impairment from the brain injury. However, there was evidence that his current symptoms were the result of depression which is common with the type of injury plaintiff suffered, and that if it were treated properly, it would improve plaintiff's ability to focus and concentrate, and improve his insomnia. If so, his future medical expenses and future pain and suffering would be limited in amount and duration. In light of the evidence, the trial court was justified in finding that the award of noneconomic damages was excessive.

The trial court did not abuse its discretion in conditionally granting defendant's motion for new trial for excessive damages.

> 5. *Whether the Trial Court Erred in Altering the Judgment Amount to Reflect Repayment of the Purchased Workers' Compensation Lien, Depriving Plaintiff of Prejudgment Interest on That Amount.*

Plaintiff argues that the trial court erroneously credited the amount of the workers' compensation lien against the judgment. We disagree.

In part 3 we addressed the propriety of the court order amending the judgment to provide for a setoff in the amount of the workers' compensation lien. As we discussed in that section, Labor Code section 3856 requires that the lien amount be deducted from the amount of the judgment. (See pp. 880–881, *ante*.) The trial court ordered just what the statute required, so there was no error.

## DISPOSITION

The judgment is affirmed in full. Each party shall bear his or its own costs of appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Hollenhorst, J., and King, J., concurred.

A petition for a rehearing was denied August 7, 2012, and the petition of appellant James Russell Collins for review by the Supreme Court was denied October 24, 2012, S204760.